MARIAH BUTLER *et al.*

*v.*

JOHN H. BUTLER *et al.*

*Filed at Mt. Vernon May 9, 1896.*

1. MARRIAGE—*validity of, between persons in slavery.* A marriage between persons while in a state of slavery is not binding upon the parties to it if repudiated upon emancipation.

2. SAME—*of slaves becomes valid if affirmed after emancipation.* Ratification of a marriage between slaves by cohabitation of the parties after emancipation renders such marriage valid.

3. SAME—*common law rule as to slave marriages obtains in Maryland.* The rule as to the invalid and voidable character of a marriage between slaves has not been changed by the statute of Maryland and the decisions of the courts thereunder.

4. SAME—*second marriage after emancipation nullifies slave marriage.* A second marriage by a slave after obtaining his freedom disaffirms a former marriage contracted in slavery, and renders it null and void from the beginning.

5. DESCENT—*children of second marriage contracted in freedom inherit.* The children of a marriage contracted while the father was a slave, which marriage was disaffirmed by a second marriage after he became free, are incapable of inheriting from the father; and the widow and children of such second marriage will inherit.

APPEAL from the Circuit Court of Lawrence county; the Hon. S. Z. LANDES, Judge, presiding.

This is a bill filed by appellees in the circuit court of Lawrence county for the partition of certain lands and to remove a cloud from the title.

The evidence shows that in July, 1893, one Allen Butler, late of Lawrence county, died intestate, and at the time of his death was seized of certain lands lying in said county and here in controversy. Said Allen Butler, then a slave, and Mary Ann House, a free negro woman, were married at Jefferson, Frederick county, Maryland, July 24, 1841, by a minister of the German Reformed church, with the consent of Butler's owner and in accordance with the custom governing such marriages in Maryland. They lived together in Maryland as husband and wife until he left the State, in 1851, and to them were born four children, two of whom, John H. Butler and Catherine Brooks, (appellees herein,) survive. Of the other two one died in infancy and one was killed in the war of the rebellion. Butler was bought as a slave, about the year 1851, from his former mistress, and with his new owner moved to the State of Ohio that year and there acquired his freedom. His family remained in Maryland. On November 14, 1854, he was united in marriage at Springfield, Ohio, to Mariah Conway, a free negro woman, by a minister of the gospel, according to the laws of Ohio. He and said Mariah lived together as husband and wife in Ohio fourteen years, and during that time two sons were born to them, viz., William D. Butler and Oscar Butler. In 1868 Butler moved, with appellants Mariah, William D. and Oscar Butler, to Lawrence county, Illinois, where he and Mariah lived and cohabited together as husband and wife until his death, in 1893. After his death Mariah and Oscar returned to Ohio. William's whereabouts are unknown. The lands in controversy were leased by said Mariah to Wade Vangilder, and he

took possession as tenant. On October 9, 1893, Callahan, Jones & Lowe recovered a judgment against William D. Butler, defendant below, for the sum of $110 and costs of suit. A mortgage was recorded September 18, 1893, in said Lawrence county, given by said William D. Butler to Gee & Barnes and Stephen C. Lewis upon the lands in question, and from the recitals of the decree entered in the case it appears that a mortgage was given by said Oscar also on these lands, all of which mortgages and judgment remain unsatisfied. Letters of administration were issued on the estate of Allen Butler, deceased, to Stephen C. Lewis, as administrator, July 17, 1893.

A decree was entered in the case at bar in favor of complainants, finding that Mary Ann Butler is the legal widow of Allen Butler, deceased, and John H. Butler and Catherine Brooks are his only heirs-at-law; that the defendant Mariah Butler was not, at the date of the death of said Allen Butler, and never had been, his lawful wife, and that any marriage or attempt of marriage was absolutely void and of no effect whatever, and that defendants William D. Butler and Oscar Butler were not the legitimate heirs-at-law of said Allen Butler and had no interest in said real estate described in the bill of complaint, and that no person or persons other than the complainants Mary A. Butler, John H. Butler and Catherine Brooks have any interest in or title to said lands. It was also decreed that the mortgages given by defendants William D. Butler and Oscar Butler, respectively, were clouds upon the title of complainants and were null and void, and that said mortgage deeds be delivered up to be canceled by the clerk of the court, and that all persons in possession of said real estate surrender to said complainants such occupancy and control. Commissioners were appointed to assign dower and to make partition of the remainder of the lands. From this decree defendants Mariah Butler and Oscar Butler and Philip C. Barnes bring the case to this court by appeal.

GEE & BARNES, for appellants:

Persons born slaves were mere chattels in the eye of the law, and incapable of having or transmitting any inheritable blood as to each other. Cobb on Slavery, secs. 262-275.

A slave was a mere chattel, having no power to contract. *Blakely* v. *Terrel,* 14 Rich. Eq. 100 ; *Washington* v. *Washington,* 69 Ala. 281; *State* v. *Adams,* 65 N. C. 537.

Marriage between slaves may be annulled by themselves. *McReynolds* v. *State,* 5 Coldw. 18.

A marriage between slaves, void at the time, is made valid by ratification of the parties after they become free. *Jones* v. *Jones,* 36 Md. 447.

It was an inflexible rule of African slavery that a slave could not contract—not excepting a contract of marriage. *Hall* v. *United States,* 92 U. S. 27; *McDowell* v. *Sapp,* 39 Ohio, 558; *Johnson* v. *Johnson,* 45 Mo. 595.

As to the power of enabling acts, see *Callahan* v. *Callahan,* 36 S. C. 461.

Courts will presume a previous divorce in order to sustain the second marriage. *Blanchard* v. *Lambert,* 43 Iowa, 228 ; *Harris* v. *Harris,* 8 Ill. App. 57 ; *Schmisseur* v. *Beatrie,* 147 Ill. 210; *Cole* v. *Cole,* 153 id. 585; *Boulden* v. *McIntyre,* 119-Ind. 574; *Hull* v. *Rawls,* 27 Miss. 471.

P. G. BRADBURY, for appellees:

To constitute a valid marriage in the State of Maryland it has always been necessary to have superadded to the civil contract some religious ceremony or celebration. *Denison* v. *Denison,* 35 Md. 361.

Prior to the act of 1777 (chap. 12) a slave could not marry in Maryland because he was a slave, and such a marriage constituted an invasion of the master's rights. (1 H. & McH. 559.) For the purpose of legalizing marriages the act of 1777 (chap. 12) was passed. Section 11 of that act says: "That if any minister shall willfully publish bans of matrimony between any servants, or be-

tween a free person and a servant, or if he shall wittingly celebrate the rite of matrimony between such without leave of the master or mistress of such servant, he shall forfeit and pay for every offense fifty pounds current money.".

In *Jones* v. *Jones*, 36 Md. 447, it was said that the above section authorized slaves to marry ; and afterwards, in *Jones* v. *Jones*, 45 Md. 144, the same court decided that even if slaves married without the consent of the master it did not render the prohibited marriage void.

When a marriage in fact is shown, the law raises a strong presumption in favor of its legality, and the burden is cast upon the party questioning its validity to show it is void. *Johnson* v. *Johnson*, 114 Ill. 611; *Jones* v. *Gilbert*, 135 id. 27.

J. E. McGAUGHEY, also for appellees:

If the former marriage was legal and binding under the laws of the State of Maryland, the second marriage was meretricious from the beginning, and void, and the last named children cannot inherit from their father. *Cartwright* v. *McGowan*, 121 Ill. 388.

The validity and construction of a contract are governed, in general, by the law of the place where the contract is made. *Mumford* v. *Canty*, 50 Ill. 370; *Lewis* v. *Hadley*, 36 id. 433 ; *Woodward* v. *Brooks*, 128 id. 222.; *Nixon* v. *Halley*, 78 id. 611.

Per CURIAM: The question as to the validity and effect of marriages between men and women, celebrated when in a state of slavery, as the institution of slavery existed in many States of the Union prior to its abolition, has been considered by the courts of last resort in several cases in different States. While the decisions are not harmonious in all respects, they practically agree that while such marriages were recognized and encouraged in all of the States where slavery existed, they gave rise to no civil rights, and were not binding upon

the parties to them if repudiated upon emancipation.
They were regarded as inchoate and imperfect obliga-
tions, having substantially the same binding force as,
and no more than, marriages between infants at common
law, the boy being under the age of fourteen and the girl
under the age of twelve years, or between lunatics or in-
sane persons. Such marriages were voidable, and might
be repudiated or ratified when the disability ceased.
The Supreme Court of Ohio has so held in the well-con-
sidered case of *McDowell* v. *Sapp*, 39 Ohio St. 558, in which
the facts were similar to the facts in this case. In that
case there was a slave marriage. The parties to it lived
and cohabited together as husband and wife for many
years. The husband escaped to Canada and obtained
his freedom, and while there was joined in marriage to
another woman, by whom he had children. Possessed
of property and dying intestate in the State of Ohio, his
slave-wife, after emancipation, appeared and claimed, as
his widow, to be entitled to his property, but it was held
that the second marriage was valid and that it disaf-
firmed the first. The court said, quoting from Bishop
on Marriage and Divorce: "That the duties of husband
and wife are incompatible with those of a slave is a
proposition evidently sound in law, and upon it the doc-
trine which denies to slaves the power of matrimony may
well rest." And the court further said: "But although
such marriages were of imperfect obligation, we are un-
willing to say they were mere nullities. They were,
indeed, not only countenanced, but, for most cogent rea-
sons, encouraged by both white and colored at the places
where they were solemnized. A marriage celebrated
during insanity of the parties, or where they were too
young to give consent, or where impotence existed, is
ratified by cohabitation subsequent to the removal of the
disability; a contract of marriage obtained by fraud be-
comes unimpeachable by cohabitation after the fraud is
discovered; and a slave marriage becomes entirely valid

by cohabitation subsequent to emancipation. But in all these cases, where there was no such ratification the marriage might be avoided in some form." The court also said: "We have not found a single case, nor do we believe one can be found, which would support us in saying that this property shall be wrested from the daughters of Peter and Rachel Dunlap,"—that is, the children of the second marriage. To the same effect are the following cases: *Johnson* v. *Johnson*, 45 Mo. 595, *McReynolds* v. *State*, 5 Coldw. (Tenn.) 18, and the recent case of *Williams* v. *Kimball*, 16 S. E. Rep. (Fla.) 783. See, also, *Jones* v. *Jones*, 36 Md. 567; 11 Am. Rep. 505; *Ross* v. *Ross*, 34 La. Ann. 860. Other cases are referred to by counsel and might be cited, but they do not materially differ in the respect mentioned. See, also, 1 Bishop on Marriage, Divorce and Sep. chap. 21, "Slave Marriages."

It is insisted, however, that the rule was different in Maryland, and that under the laws of that State slave marriages were as valid and binding in law as marriages solemnized between free persons, and the depositions contained in the record of two lawyers of Maryland tend in some degree to support appellees' contention. Their conclusions, however, are based upon the reported decisions of the Court of Appeals of that State, to which reference is made. While it may be true, as stated, that slavery existed in Maryland in a milder form than in most of the slave-holding States, and that, after the passage by the legislature of Maryland of the act of 1777, slaves could be lawfully joined in marriage, yet we are unable to conclude that any different or greater rights arose by virtue of such marriages than from those between slaves celebrated under laws of other States.

The principal case referred to and upon which reliance is placed, is *Jones* v. *Jones*, 36 Md. 567, (11 Am. Rep. 505.) In that case, as in the case at bar, the children were born of a free woman, the father, only, being a slave, and it was said that the children were capable of inheriting, as

it is said in the testimony in this case that the children were capable of inheriting, from the mother, she being free; but in that case the father became free many years before his death, and continued to live and cohabit with his wife as before his emancipation, and what was said in the opinion must be considered with reference to the facts in the case. Among other things it was there said: "When he" (David Jones, who, when the marriage was celebrated, was a slave,) "afterwards acquired his freedom certain civil rights vested in him as a consequence, such as the right to acquire by purchase or inheritance and to hold and dispose of property. Upon his death the property of which he might then be seized or possessed would descend upon his children, they being free." In combating the argument, as applied to slave marriages, that the marriage must be valid at its inception and can not be rendered valid by mere subsequent ratification, the court further said: "But there are cases in which marriages contracted between parties not capable of contracting at the time of the marriage are made valid by the subsequent ratification of the parties, as in the case of lunatics and infants, and that without any other or new celebration. (*Cole* v. *Cole*, 5 Sneed, 63; *Wrightman* v. *Wrightman*, 4 Johns. Ch. 345; 1 Blackstone's Com. 436.) *We think that the same law should apply to cases of marriages between slaves who ratify the marriage after they become free.*" And further, quoting from Mr. Bishop in his comments on *Howard* v. *Howard*, 6 Jones, (N. C.) 235, in his work on Marriage and Divorce, the court said: "In the facts of this case there is involved the particular matter upon which the writer of these volumes deems that the decision in all such cases ought, in principle, to turn. If, after the emancipation, the parties lived together as husband and wife, and if, before emancipation, they were married in the form which either usage or law had established for the marriage of slaves, this subsequent mutual acknowledgment of each other as husband and wife should be

held to complete the act of matrimony, so as to make them lawfully and fully married from the time at which this subsequent living together commenced."

We have quoted extensively from this case because appellees seem to rely upon it as sustaining their position that the marriage continued binding notwithstanding Allen Butler repudiated it upon his emancipation, married another woman, and lived and cohabited with her as his wife for nearly forty years, and brought up children, the fruit of such second marriage. It is not doubted that the validity and binding force of the first marriage must be determined by the laws of Maryland, but while there are some expressions in the opinion of the case above referred to which, standing alone, tend to sustain the views of appellees, the whole case, when considered with reference to its facts, states the law as it has been generally held to be in other States.

The act of 1777 of the Maryland legislature, referred to in the record and also in *Jones* v. *Jones, supra,* purports to be set forth in the deposition of one of the witnesses whose depositions were taken, to establish the laws of Maryland in relation to slave marriages. It is not important to consider whether the statute was or was not properly proved, as no point is made in that regard. The only provision having any special bearing on the question is section 11, which appears to have been as follows: "That if any minister shall willfully publish the bans of matrimony between any servants, or between a free person and a servant, or if he shall wittingly celebrate the rite of matrimony between any such without leave of the master or mistress of such servant, he shall forfeit and pay for every offense fifty pounds current money." And this is the section referred to by the Court of Appeals of Maryland in *Jones* v. *Jones, supra.*

We are not referred to any case, and we know of none, where, in a case like this, the first marriage has been held valid as against the second, and the children

of the slave marriage the legal heirs as against those of the free marriage. By no act of Allen Butler, after his emancipation, did he affirm the slave marriage, but by his second marriage, celebrated in conformity to the laws of Ohio, he expressly disaffirmed it. For nearly forty years he and his wife, Mariah, lived together and were recognized as husband and wife. They had and reared children, and by the united efforts of the family accumulated the property in dispute. Mary Ann, the other party to the slave marriage, by her conduct repudiated it also. She formed illicit relations with another man, by whom she had several children. These considerations would not, of course, affect the binding force of a marriage incapable of dissolution except by death or decree of court, but they clearly establish that the parties to the slave marriage, instead of affirming, expressly disaffirmed it after Allen Butler's emancipation, and such disaffirmance should be held to have nullified the slave marriage, if capable of nullification by the act and consent of the parties to it.

Following the almost unbroken line of authorities on the question, we are of the opinion that the marriage of Allen Butler to Mariah Conway was lawful, and that she is his lawful widow. It follows, that the complainant Mary Ann Butler has no interest in his estate. Upon well recognized legal principles it follows also, that the disaffirmance of the slave marriage rendered it null from the beginning, to the same extent as would a decree of nullity rendered by a court of competent jurisdiction between parties incapable in law of contracting a valid and binding marriage, and made the issue of the slave marriage incapable of inheriting from the father, in the absence of any statute to the contrary. (14 Am. & Eng. Ency. of Law, 538.) In 2 Bishop on Marriage, Divorce and Sep. (sec. 277) it is said: "The doctrine has sometimes a limit under the operation of a statute, but it appears to be universal, under the unwritten law, that when a

voidable marriage is set aside by a decree of nullity the parties are regarded as never having been married. For example: The children before legitimate become, by force of the decree, illegitimate." In another part of his valuable work (sec. 672, *et seq.*) Mr. Bishop contends, with strong force of reason, that children of slave marriages not regarded as illegitimate in slavery should not be bastardized by the act of disaffirmance of their parents in freedom, but that the law, choosing for them as in other cases, would choose that which is most to their advantage,—would choose legitimacy rather than illegitimacy. This reasoning would seem to flow from the view that the disaffirmance of the slave marriage by the second marriage in freedom should be regarded rather as a divorce than as a disaffirmance of a void or voidable marriage; and the learned author himself says (sec. 676) that "possibly if, during slavery, one actually disaffirms his slave marriage by contracting another and valid one in a free State, the emancipated children of the former will not be admitted to succeed their father as his heirs on his death. It appears to have been so adjudged in a Canada case, (*Harris* v. *Cooper*, 31 Upp. Can. Q. B. 182,) commented on without disapprobation in an Ohio one." (*McDowell* v. *Sapp*, *supra*.) See, also, *McDeed* v. *McDeed*, 67 Ill. 545, where the legitimacy of the issue of a voidable marriage which had been disaffirmed was saved by the laws of Ohio, where the marriage was celebrated.

In view of the authorities on this subject we are inclined to the opinion, and must hold, that the children of Allen Butler by the slave marriage are not, under the facts in this case, his heirs-at-law, but that the issue of the second are his heirs-at-law. It cannot be claimed that the statute of this State passed in 1891, relating to slave marriages, can affect the status of these parties.

The decree of the circuit court is reversed and the cause remanded for further proceedings consistent with this opinion.                    *Reversed and remanded.*