## *KENNEDY v. PAWNEE TRUST CO. *et al.*

### No. 1634. Opinion Filed February 6, 1912.

### Rehearing Denied June 25, 1912.

### (126 Pac. 548.)

1. **APPEAL AND ERROR—Review—Questions of Fact.** Where, in a trial before the court, special findings of fact are made which are reasonably supported by the testimony, such findings will not be disturbed on the weight of evidence.

   (a) This rule applies with particular force where the evidence of the successful party is all presented by the witnesses in open court, testifying through an interpreter, while the material testimony of the unsuccessful party is all given in the form of depositions.

2. **TRIAL—Exclusion of Competent Evidence.** It is not error to exclude incompetent and irrelevant testimony.

3. **APPEAL AND ERROR—Review—Presumptions.** Where, in the trial of a case before the court without the intervention of a jury, incompetent testimony is admitted together with other testimony that is competent to the material issues, this court will not reverse the findings or judgment of the trial court, unless it appears that the court in reaching its decision relied on such incompetent evidence.

4. **QUIETING TITLE — Evidence — Sufficiency.** Testimony examined, and held sufficient to support the findings of the trial court.

5. **WITNESSES—Impeachment—Character of Witness—Competency of Evidence.** Testimony as to the general reputation for virtue and chastity of a witness is incompetent and improper.

(Syllabus by Sharp, C.)

*Error from District Court, Hughes County;*
*John Caruthers, Judge.*

Action by Earl M. Kennedy against the Pawnee Trust Company and others to quiet title to real estate, and for other relief. Judgment quieting in the Pawnee Trust Company, and plaintiff brings error. Affirmed.

*O. A. Morton,* for plaintiff in error.

*Warren & Miller,* for defendants in error.

*Appealed to the United States Supreme Court.

Opinion by SHARP, C. This controversy arises between the grantees of William Barnett, the alleged nephew of Stephen Reed, deceased, the allottee of the lands in question, and John Baker, the alleged uncle of said Stephen Reed.

The testimony of Jincy Barnett, grandmother of William Barnett, and Socer Barnett and Elizabeth Barnett, her sisters of the half-blood, was offered on the part of the plaintiff; that of John Baker, Josie Yarhola, William Lowe, Josiah Looney, and Tucker Barnett, on the part of the defendants. The primary question determined below and necessary to be determined here is that of the marriage of Jimson Reed and Jincy Barnett. The testimony on this issue was conflicting. The case, without objection, was tried by the court.

Among other findings of the court is the following:

"The court finds that Jincy Barnett was not the wife of Jimson Reed, and that William Barnett is not the nephew or related at all to Stephen Reed, and that William Barnett has not, and never had, any right, title, or interest in or to the allotment of Stephen Reed, and that the plaintiff, Earl M. Kennedy, as the grantee of said William Barnett, or otherwise, has no right, title, or interest in or to the said allotment of Stephen Reed, hereinafter described. The court finds that Stephen Reed was a full-blood Creek Indian, and that there was allotted to him certain lands in the Creek Nation; that his sole and only heir at law is the defendant John Baker; that the said John Baker is a brother of Jimson Reed, the father of the said allottee, Stephen Reed; that as the sole heir of Stephen Reed the said John Baker became the owner by inheritance of the said allotment of the said Stephen Reed; that on the 9th day of August, 1907, the said John Baker conveyed to the Pawnee Trust Company, defendant herein, 120 acres of said allotment."

The first question presented is whether there is evidence reasonably tending to support the findings of the trial court. If so, such findings will not be disturbed on the weight of the evidence. This renders necessary a review of the testimony. Jincy Barnett testified: That Jimson Reed was her husband and Lydia their daughter. That Stephen Reed was a son of Jimson Reed. That Lydia Reed married Wilson Harry, and William Barnett was their child. That she was married to Jimson before Lydia was born. That she was also married to Charley Sullivan un-

der the Indian law. That her first husband was Boston McGilbray, a negro, by whom she had several children. Charley Sullivan was a mixed blood, Indian and negro. After witness and Jimson separated, she married Jack Barnett. Was married to Jim Barnett before the Civil War, and had one child named Lizzie Vann. Ned Holmes, a negro, was the father of her child, Caesar Holmes. Was also married to John Simmer or Johnson, who was the father of Lummie. Jimson Reed was a full-blood Creek Indian, as was John Simmer. When she began living with Jimson, she was living in a house by herself near her father's. Jimson gave her money to buy what she needed, and she cooked and washed for him. Jimson worked for her father and slept in the little house with her, where she had lived all her life.

Socer Barnett testified: That she knew William Barnett, son of Lydia Reed. That Lydia Reed was the daughter of Jincy Barnett and Jimson Reed; had two other children, Stephen and Martha. That Jimson Reed and Jincy Barnett lived together as man and wife about the time Lydia was born. That Jimson was a full-blood Indian. That William Barnett's father was Wilson Harry. He and Lydia Reed lived together a short time, about the date of William's birth. That Jincy was a grown woman when Socer was born. That she, Jincy, was about two years younger than Jimson. That Jincy never lived with Jack Barnett; did not know who Mary Holmes' father was. Jincy never lived with Ned Holmes, nor with John Simmer. Jincy and Jimson lived together until the child was born, and while Jimson was working for her father, some four years, and during the time she got a child. When he quit working for her father, he went about four miles south, near Alabama, and lived with a woman named Amogee. Before the Civil War the witness lived in the Choctaw Nation, and came back to live with her father about 1866; had a conversation with John Baker, who did not deny that Jimson and Jincy had been married.

Elizabeth Barnett testified: That Lydia Barnett was William Barnett's mother, and that Lydia Reed's father was Jimson Reed. That Jimson Reed and Jincy Barnett lived together as man and wife, and were so living when Lydia was born. Jimson Reed

had another child, named Stephen. That she was about twelve years old, big enough to beat "softkey," at the time of the War, while Jincy was a grown woman with three children at the beginning of the War. That Jincy lived with Boston McGilbray before the War. Did not know Charley Sullivan, and did not know her sister ever lived with Jim Barnett, but that Jack Barnett was the father of her child Mary, and they were at her home when the child was born. That Jincy lived with John Simmer, who was the father of Lummie. That Jincy also lived with Ned Holmes, who was the father of Caesar. That "Jimson and Jincy married just like we all married, the way I was married. They just took up and lived together. When I visited Jincy, I would see Jimson Reed at her house."

On the part of the defendants, the witness John Baker testified: That he and Jimson Reed were brothers, and that Pafna was their father. That Stephen Reed was a son of Jimson Reed, but that Stephen Reed's mother was Astonardy, who was married to Jimson Reed about four years after peace was declared after the War. That Jimson and Astonardy lived near Alabama, and were both full-blood Indians. When Jimson came back from the War, witness was living at the home of Ward Coachman at Alabama, north of Wetumka, and that Jimson continued to live there in that settlement afterwards. That Jimson belonged to the House of Warriors of the Creek Council, and was considerably older than the witness. Lived in the neighborhood about six years, when he was killed in a drunken brawl. That at the time of his death he was living with Astonardy. That at about the close of the Civil War Jincy Barnett lived north of Weleetka, near Scipio Barnett's place, in a little log cabin. That Jinson and Jincy were not related, and that witness did not know that they lived together as husband and wife, or that they were ever married. That Jincy Barnett was never married to anybody, and that Jincy and Jimson never lived together as man and wife, and were never so regarded. That Jimson Reed lived with an aunt named Hecheeska, an old woman. That he saw Jimson Reed occasionally when they visited. That he lived about five miles from where witness lived. That Jimson lived continuously

with his aunt. That Jimson Reed was killed about one or two years before the Speicha Insurrection, some 21 years ago. That he did not know that Jincy Barnett ever lived as a married woman, or that she had a husband to take care of her. That, according to his own personal knowledge, no man ever lived with her. That he had not seen Jincy in a great many years, until recently, and that during the time he testified about, according to the Indian law of marriage, it was only necessary to have the mutual consent of the parties to live as man and wife.

Josie Yarhola testified: That she knew Jimson Reed in his lifetime, and, when he came back from the North after the Civil War, she was living at Greenleaf town. That Jimson Reed came back to the place where a man by the name of Espama Yarhola lived, right close to Alabama Square. That Jimson Reed married Astonardy, and lived near Alabama up until the death of Jimson Reed. That she knew Jincy Barnett, who lived at the place where Dick Barnett now lives. That she and Jimson Reed never lived together as husband and wife, but did not know whether the people considered them as husband and wife. Did not know how long after the Civil War it was that Jincy Barnett settled in that community.

William Lowe knew Jimson Reed after he came back from the army. He lived north of Wetumka and south of Weleetka, and lived there all the time up until the date of his death. Knew Jincy Barnett, who lived two miles north of Weleetka. She and Jimson Reed never lived together as man and wife. Never knew that Jincy Barnett ever had a husband, never saw anybody that was claimed to be her husband. At first he lived four miles from where Jincy Barnett lived, and then moved. Would often see Jincy Barnett at Col. Robertson's, where she did the cooking. First saw Jimson Reed at Alabama, after he came back from the War, but did not know when it was.—

"Think it was about three years after the people came back to the county from the Civil War. He and Jimson were companions after they came back. Jimson Reed was married to Astonardy, and also to a woman named Amoochee, but don't know which he married first."

Josiah Looney testified: That from the close of the Civil War and for several years thereafter he lived about two miles and a half from Scipio Barnett's place; knew his daughter, Jincy, also Jimson Reed, but some time after he settled down there near Weleetka. Jimson came back from the North about the third year after the close of the Civil War, and after the people had settled down; did not know that Jimson Reed and Jincy Barnett ever lived together as husband and wife. Jincy Barnett was never married.—

"I settled down near Weleetka about two years after the Civil War, where I lived for about five years. Did not know Jimson Reed before the War. First saw and got acquainted with him when I met him near Weleetka. Jimson Reed was killed about ten years after I met him. He married Astonardy soon after I first saw him. Jincy Barnett had children, one named Lydia, and another named Lizzie, and another whose name I do not know; also a boy named Lummie and another named Caesar."

Tucker Barnett testified that from about 1865 to 1870 he lived north of Weleetka with his mother within one-quarter of a mile of where Jincy Barnett lived. Knew her and Jimson Reed well. They never lived together as husband and wife. Jimson Reed never worked for Jincy Barnett's father during the above time. He was living on the same place with Jincy Barnett's father. Was living there when her child Lydia was born.—

"Do not remember year or date. Jimson Reed never did go there. Lydia Reed was a half-blood. First saw and got acquainted with Jimson Reed three years after the close of the War, at Alabama town. Jincy Barnett never lived anywhere else than there where I knew her until her brother Sosash took her over on the headwaters of Bad creek in the direction of Clearview."

The foregoing is a fair, though not a full, statement of the testimony upon which the court based its decree. The testimony of the plaintiff was in the form of depositions. The witnesses for the defendant all testified through Johnson Tiger, interpreter.

It may be considered the established rule in this court that, where a cause is submitted to a court without a jury, a gen-

eral finding of the court is equivalent to a general verdict; and where the evidence is conflicting upon material issues involved, or there was evidence reasonably tending to establish the allegations of the prevailing party, the finding of the court will not be disturbed on appeal to this court. *Davis v. Smith et al.*, 28 Okla. 852, 115 Pac. 1017; *J. I. Case Threshing Mach. Co. v. Oates*, 27 Okla. 412, 112 Pac. 980; *Freeman v. Eldridge*, 26 Okla. 601, 110 Pac. 1057; *First National Bank v. Lookabaugh*, 28 Okla. 608, 115 Pac. 786; *Roberts v. Markham*, 26 Okla. 387, 109 Pac. 127; *Runyan v. Fisher*, 28 Okla. 450, 114 Pac. 717; *Alcorn et al. v. Dennis*, 25 Okla. 135, 105 Pac. 1012; *Eager et al. v. Seeds*, 21 Okla. 524, 96 Pac. 646; *Bretch Bros. v. S. Winston & Sons*, 28 Okla. 625, 115 Pac. 795; *Smith v. Stewart*, 29 Okla. 26, 116 Pac. 182; *Hunter v. Spencer*, 21 Okla. 155, 95 Pac. 757, 17 L. R. A. (N. S.) 622. But in the case at bar there were special findings, the first of which was that Jincy Barnett was not the wife of Jimson Reed, thus showing that the court weighed and considered the testimony with special reference to this important question of fact. We have carefully read and considered the testimony, and find that much of it is unsatisfactory, some incompetent. We regard the testimony of John Baker entitled to little, if any, weight, and find the testimony of Jincy Barnett far short of satisfactory.

The testimony offered by the defendants for the purpose of showing the general reputation for virtue and chastity of Jincy Barnett was, as contended for by plaintiff in error, incompetent and improper, and should not have been admitted. *Warren v. Canard*, 30 Okla. 514, 120 Pac. 599. Josie Yarhola, William Lowe, and Tucker Barnett testified positively that Jincy Barnett and Jimson Reed never lived together as husband and wife. The latter witness lived within a quarter of a mile of Jincy Barnett from 1865 to 1870, while Josiah Looney testified that Jincy Barnett was never married.

Where the case is tried before the court, this court will not reverse for the admission of incompetent evidence, unless it appears that the court, in making the decision, relied on such in-

competent evidence. Here it does not so appear. *White v. White,* 82 Cal. 427, 23 Pac. 276, 7 L. R. A. 799.

Nor do we think that the court erred in not permitting the plaintiff in error on cross-examination of Josiah Looney and Tucker Barnett to prove that Jim Barnett had resided with another woman as her husband in the same community with Jincy Barnett subsequent to his alleged marriage to her, and there raised a family of children. Jincy testified that she was married to Jim Barnett before the War; and the fact that Jim Barnett subsequent to the time of his marriage with Jincy Barnett married another woman, by whom he raised a family, was immaterial. In order for a marriage between Jim Barnett and Jincy Barnett to have had any effect after the emancipation, the latter having been a slave, they must have lived and cohabited together as man and wife at the time of or after emancipation. *Wood v. Cole et al.,* 25 Tex. Civ. App. 378, 60 S. W. 992; *Cumby v. Garland et al.,* 6 Tex. Civ. App. 519, 25 S. W. 673; *Waff et al. v. Sessums,* 28 Tex. Civ. App. 183, 66 S. W. 865; *Butler et al. v. Butler,* 161 Ill. 451, 44 N. E. 203; *McDowell v. Sapp,* 39 Ohio St. 558; *Sterrett v. Samuel,* 108 La. 346, 32 South. 428; *Adams et al. v. Sneed,* 41 Fla. 151, 25 South. 893; *State v. Samuel,* 19 N. C. 177. But the testimony below showed that Jincy Barnett and Jim Barnett were not living together as man and wife at the time of the emancipation, and there is no evidence that they ever lived together as man and wife after the date of the Emancipation Proclamation. This fact is urged by counsel for plaintiff in error in his brief. Even if the alleged marriage was not a slave marriage, and conceding for argument's sake that Jincy Barnett was *sui juris,* in such case the presumption would be that the first marriage was legally dissolved before the second was entered into. 1 Bishop on Marriage, Divorce, and Separation, sec. 956; *Boulden et al. v. McIntire,* 119 Ind. 574, 21 N. E. 445, 12 Am. St. Rep. 453; *Klein et ux. v. Laudman et ux.,* 29 Mo. 259; *Scott's Adm'r et al. v. Scott,* 77 S. W. (Ky.) 1123; *Schmisseur et al. v. Beatrie et al.,* 147 Ill. 210, 35 N. E. 525; *Erwin, Adm'r, v. English,* 61 Conn. 502, 23 Atl. 753; *A. & V. Ry. Co. v. Beardsley,* 79 Miss. 417, 30 South. 660, 89 Am.

St. Rep. 660; *Nixon v. Wichita L. & C. Co.,* 84 Tex. 408, 19 S. W. 560. Such being the fact, testimony tending to show that Jim Barnett married again and raised another family was immaterial and properly excluded.

In the presentation of the testimony in this case, the facts were somewhat out of the ordinary. Plaintiff's testimony being in the form of depositions, the court did not have the opportunity to judge of the witnesses' manner or conduct while testifying. It is sometimes difficult and impossible to get so full, explicit, and perspicuous a statement of facts from witnesses through depositions as it is by their examination before the court or jury. The best evidence, of course, is the testimony of the witness himself, given in the presence of the court or jury. A deposition cannot be considered a full equivalent. 14 Enc. of Evidence, 117, and authorities cited. The same author, in the following section, comments upon the great difficulty in getting the true meaning of a foreign witness, who testifies through an interpreter. In *Kessel et ux. v. Kessel et ux.,* 79 Wis. 289, 48 N. W. 382, it is said:

"The witnesses were Germans. Some of them testified through an interpreter, and their testimony, as it appears in the record, is somewhat confused. In such a case the opportunity of seeing the witnesses and hearing their testimony is invaluable; indeed, almost essential to a correct understanding of their testimony. The circuit judge had this advantage, and we should hesitate to disturb his findings on mere questions of fact, even though we might have some doubt of their accuracy. But we have here no such doubt."

Confronted as we are with the depositions of an illiterate people on the one hand, and the testimony given through an interpreter of untutored witnesses, but who were present in court, and by the only means possible gave their testimony through an apparently intelligent interpreter, on the other hand, we should be slow, indeed, to disturb the findings of fact of the court; the testimony being conflicting. We cannot agree with counsel that there was no competent evidence offered on the part of the defendants. The fact that witnesses living near, and who had the opportunity themselves to know the relationship, if any existed,

between Jincy Barnett and Jimson Reed, testified positively that they did not live and cohabit together as man and wife, was both competent and strong evidence for the defendants and directly contradicted the testimony of the plaintiffs' witnesses on that issue.

The court further found that the sole and only heir of Stephen Reed, deceased, was the defendant, John Baker. It is not disputed that John Baker was the brother of Jimson Reed, therefore the uncle of Stephen Reed. The relationship of the respective claimants to Stephen Reed was a question of fact determined by the court adverse to the grantor of the plaintiff in error, and in favor of one of the grantees of the defendant in error John Baker.

It follows, therefore, that the judgment of the court quieting title of the Pawnee Trust Company in and to the 120 acres of land in controversy was warranted by the testimony, and for the reasons stated the judgment of the trial court should be affirmed.

By the Court: It is so ordered.