The People of the State of Illinois ex rel. Josephine A. Byrnes, Appellee, v. The Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago, Appellant.

Gen. No. 36,487.

Opinion filed October 10, 1933.

WILLIAM H. SEXTON, Corporation Counsel, and GEORGE F. MULLIGAN, Assistant Corporation Counsel, for appellant; GEORGE F. MULLIGAN, of counsel.

THOMAS A. HAMILTON, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

In a certiorari proceeding, the respondent, Retirement Board, etc. appeals from an order or judgment

of the circuit court of Cook county, entered on October 26, 1932, as follows:

"This cause coming on to be heard upon petition for writ of certiorari, and the motion of respondent to quash the writ issued upon said petition, and, the court having heard the arguments of counsel and having considered the briefs submitted by counsel in this cause and all parties in interest being now represented by their respective counsel.

"It Is Ordered that the motion to quash the writ of certiorari be and the same is hereby denied. It is further ordered that the action of the Retirement Board, etc., in refusing to place the name of the petitioner upon, or to restore the petitioner to, the pension roll of the said fund, be and the same is hereby reversed, and that the petitioner be restored to said pension roll *as of the date of the annulment of her marriage.*"

The verified petition of petitioner, filed April 29, 1932, after stating that it seeks a review of a certain action of the Board of Trustees of the Firemen's Pension Fund of Chicago, of which board the said Retirement Board, etc., is its successor and composed of the same persons, alleges in substance:

That petitioner married James P. Byrnes, now deceased, on March 17, 1904, while he was a member of the Chicago fire department, and lived with him as his wife until his death on March 7, 1926, during all of which time he was a member of said fire department; that after his death petitioner made application for and was granted a widow's pension, in accordance with section 10 of an act of the Illinois legislature, passed in 1917 and amended in 1925, entitled "An Act to provide for a firemen's pension fund and to create a board of trustees to administer said fund in cities having a population exceeding 200,000 inhabitants," Cahill's St. ch. 24, ¶ 951 (section as amended set forth); that the section as amended remained in force continuously

until July 1, 1931; that petitioner, after she had been granted the pension, "went through a marriage ceremony" with Frank Mawson on April 7, 1928, at Crown Point, Indiana; that payments on the pension were made to her "up to and including January 10, 1929," when said Firemen's Pension Board, "on notice by petitioner of said marriage ceremony," discontinued said pension; that petitioner lived with Frank Mawson intermittently from April 7, 1928, until February, 1930, but not as man and wife; that the purported marriage was annulled in the circuit court of Cook county on June 6, 1930 (certified copy of annulment decree attached); that the Firemen's Pension Board was duly notified of the annulment, and petitioner filed an application with the board, requesting the reinstatement of her name on the pension roll and the payment to her of her pension from January 10, 1929, and thereafter; that a hearing before the board was had, at which petitioner presented evidence of the annulment, but that her application was denied; that the decision of the board "was that the said annulment did not render the subsequent marriage of petitioner void *ab initio* so as to entitle petitioner to be restored to the pension roll"; and that petitioner asks for a review of that decision, as it "involves a question of law and not of fact."

The decree of annulment of June 6, 1930, is signed by the Honorable Thomas J. Lynch, one of the judges of the circuit court of Cook county, and was on that day duly entered of record. After stating in substance that as to the issues made by complainant's bill and defendant's answer, evidence was heard in open court on May 15, 1930, at which time the respective parties were present by solicitors, the court found, in part, that due notice of the pendency of the suit was had by personal service on the defendant and that the court has jurisdiction of the parties and the subject matter;

that the parties, pursuant to a license to solemnize marriage issued by the county clerk of Lake county, Indiana, "took part in a purported marriage ceremony on April 7, 1928, at Crown Point, Indiana"; that subsequent to the ceremony the parties never cohabited as husband and wife and that no consummation of the purported marriage was had; that the reason for such non-cohabitation was due to the fact that the defendant "was impotent." And the court decreed that "the purported marriage ceremony be declared null and void, and it is hereby annulled" and the court further found that "the legal status of complainant did not change as a result of the purported marriage ceremony, and that a legal marriage never existed between the parties."

During May, 1932, the respondent, Retirement Board, etc., was duly served with process in the certiorari proceeding, and on May 17, 1932, it appeared by the corporation counsel of the City of Chicago, and 'one of his assistants, and moved to quash the writ. The court's order appealed from, as first above mentioned, was entered after a full hearing and argument by the respective attorneys on the motion to quash. No evidence was introduced. The present transcript, however, contains what purports to be a stenographic report of the proceedings on the hearing, including statements by opposing counsel and the court, and also the court's reasons for its decision including references to numerous adjudicated cases. These proceedings are abstracted in appellant's printed abstract here filed. It appears that after the court (Judge Thomas Taylor) had stated it to be his opinion that "the petitioner is entitled to reinstatement on the pension roll and to the payment of her pension according to law, and that the ruling of the Pension Board must be reversed," the question arose at what date the payment of her pension should recommence, whether

on January 10, 1929 (when it had been discontinued) or on June 6, 1930 (when the annulment decree of petitioner's marriage to Frank Mawson had been entered), and the following in part occurred:

"MR. BYRNES (attorney for petitioner): When does the reinstatement take effect?

"MR. MULLIGAN (attorney for respondent): There are two questions involved, besides of course the question whether or not the holding of your Honor *ipso facto* restores her to the pension roll. . . . Does this annulment of the marriage, so far as her pension rights are concerned, commence at the date that the annulment was entered, or would she be entitled to back pension for the period that she lived with this man and received support from him, assuming that she did receive such support?

"THE COURT: Of course, the gravamen of this petition is the replacing of her on the pension roll. I think the petition asks that her name be put on as of the date it was taken off. . . . But the law will never permit a pensioner to receive, perhaps, two sources of livelihood. I suppose it must be assumed that while she was living with her second husband she was obtaining a livelihood through him, and, equitably considered, was not entitled to a pension from the board. Technically, on the face of this record, with the facts stated in skeleton form, so to speak, in the petition, without evidence, and with the ruling of the court that the annulment destroyed the marriage *ab initio,* she is entitled to a pension from the time she was taken off the pension roll. But . . . can it be said that she was entitled to that pension during the time that she actually was allied with this man, and from whom she, presumably, was obtaining support? . . . I think, if I were the petitioner, I would relinquish all claims to pension when she lived with the second husband, and have it as of the date of the decree of annulment.

I think that would avoid controversy in the court of review and would, perhaps, . . . be more in consonance with what is equitable in the case.

"Mr. Byrnes: Yes; that is right in line with the New York *Sleicher* case (251 N. Y. 366, 369) . . . I thank you for your decision."

From the draft of the order appealed from, as above stated, it appears that petitioner acquiesced in the position taken by the court and did not insist that the payment of her pension should recommence on January 10, 1929, rather than when the decree of annulment was entered (June 6, 1930). Furthermore, she has not here assigned any cross errors.

The main contention, urged by counsel for respondent as a ground for a reversal of the order appealed from, is in substance that the same is contrary to law, in that, where a marriage is annulled by the decree of a court, having jurisdiction of the parties and the subject matter, on the ground of the impotence of the husband, such decree does not render the marriage void *ab initio,* except as between the parties to the marriage. In view of the general current of authority we are of the opinion that the contention is without merit. In 2 Bishop on Marriage, Div. and Sep., 1st Ed., sec. 1596, p. 608, it is said:

"Whether the marriage which the nullity decree pronounces void was truly such or only voidable, after the decree and between the parties it is conclusively regarded as never having existed. Or, to copy from one of our books, 'if the wife becomes a single woman by operation of law, it is the same as if she had always remained single.' "

In Tiffany on Domestic Relations, Cooley's 3rd Ed., pp. 57, 58, it is said:

"Where a marriage is merely voidable and voidable by a decree of nullity only, it is valid unless a decree is obtained; and the decree must be made, if at all, during

the lives of both parties. Until it is made, the marriage is valid for all purposes. The children are legitimate; the parties are entitled, respectively, to curtesy and dower; and all other incidents of a valid marriage attach. After a decree of nullity, however, in the lifetime of the parties, the marriage is void *ab initio,* and not merely from the date of the decree. The children are rendered illegitimate, the parties have no rights in each other's property, and communications formerly made between them are no longer privileged. In other words, it is just as though no marriage had ever taken place.''

In the case of *Clerke v. Menzies,* or *Matter of Wombwell's Settlement,* 2 Law Rep., Chancery Div. 298, the action was for the return for lack of consideration of 25,000 pounds, which had been paid as a marriage settlement to certain trustees to provide an income to one Wombwell in consideration of his marriage to the daughter of the settlor. It is stated in the syllabus:

''By a settlement made in contemplation of marriage, a father transferred 25,000 pounds to the trustees of the settlement to be held upon trust for him 'until the said intended marriage,' and thereafter upon the trusts of the settlement. The marriage took place, but afterwards a decree absolute was made declaring it 'to be and to have been absolutely null and void' on the ground of the husband's impotence.

''*Held,* that the words 'until the said intended marriage' meant a valid and effectual marriage, and that, as the marriage had been declared null and void *ab initio,* the settlor was absolutely entitled to the settled funds under the express trust in his favor.''

In the opinion of the court (p. 305) it is said in part: ''The result of a decree of nullity is that not only are the parties not now married, but they never were. There never was any valid marriage.''

In the case of *Steerman v. Snow,* 94 N. J. Eq. 9, on a petition for the annulment of a marriage on the ground

of impotence, a decree of nullity was entered. And it was decided in substance that a marriage may be annulled under the statute, where there has been discovery only after marriage, or such marriage may be annulled under the inherent jurisdiction of a court of chancery relating to fraud. And in the opinion the court said (pp. 13, 14):

"In 2 Bouv. Law. Dic. (Rawle's Rev.) 527, it is stated that the distinction between a marriage absolutely void, or one voidable at the election of one or both of the parties, is important; that in the case of the latter the marriage will be treated as valid and binding until its nullity is ascertained and declared by a competent court in a suit instituted for that purpose, during the lifetime of both parties; but the effect of a sentence of nullity, when pronounced, is to render the marriage null and void from the beginning. It appears, therefore, that in either case, when a decree of nullity is pronounced, the status of the parties is as though they had never been married, and the result in the last analysis is the same, so that it is quite immaterial whether the decree is obtained for fraud under the general jurisdiction of the court or under its statutory jurisdiction."

In *Sleicher v. Sleicher*, 251 N. Y. 366, it appears that plaintiff (the wife) and defendant (the husband) were married in 1908; that by a separation agreement, made in 1923, defendant promised to pay to plaintiff for her support and maintenance, $400 per month up to June, 1924, and $350 monthly thereafter; that in case of divorce defendant agreed that an allowance for alimony at the same rate be incorporated in the decree "to continue so long as she remains unmarried"; that subsequently a Nevada court, having jurisdiction, granted a divorce to plaintiff; that by the decree all demands for alimony, maintenance and support were declared to be fixed and prescribed by the separation

agreement, made a part of the decree; that on August 16, 1924, plaintiff contracted a second marriage with one Hannum and thereafter she brought a suit in New York to annul the marriage on the ground of fraud, and in August, 1927, an annulment was granted, the basis of the decree being the fraud of Hannum ''in fraudulently concealing from the plaintiff the fact that prior to, up to and including the time of said marriage, he was insane''; that upon plaintiff's marriage to Hannum all alimony payments ceased and were never resumed; and that plaintiff's present action, begun in February, 1928, was brought to recover all unpaid instalments, she claiming that her right to alimony revived when the second marriage was annulled for fraud, avoiding it from the beginning, and that the effect of the revivor was not merely to charge defendant with the prospective liability for instalments falling due from the time of the annulment of said second marriage, but to charge him retrospectively with instalments lawfully withheld while the second marriage was in force. It was *held* in substance that while a voidable marriage is by a decree annulling it rendered void *ab initio,* it would be inequitable in the particular case to allow the plaintiff two means of support during the continuance of said second marriage. During the course of the opinion the court said (p. 369):

"A marriage procured by fraud is voidable, not void. Even so, annulment, when decreed, puts an end to it from the beginning (*Matter of Moncrief,* 235 N. Y. 390; *American Surety Co. v. Conner,* 251 N. Y. 1). It is not dissolved as upon divorce. *It is effaced as if it had never been.* From then on, payments to either spouse may be demanded and must be made on the footing of its nullity. This is true, according to the holding of some courts, where bequests of income are to be paid until remarriage. (Citing cases.) It is true and for like reasons where installments of alimony

are to be paid under a judgment. A marriage is unreal if procured by force or fraud.

"The retroactive effect of rescission from the beginning is not, however, without limits, prescribed by policy and justice. These limits are not unknown even in controversies between parties or privies to the rescinded act . . . , but they have their typical application to the rights and duties of a stranger. . . . The defendant, the first husband, must now comply with the mandate of the judgment of divorce and provide for his former wife as for one who has not remarried. This does not mean, as we view it, that he must provide for her during the years when the voidable remarriage was in force and unavoided."

In the case of *Rubin v. Joseph,* 213 N. Y. S. 460, decided by the appellate division of the Supreme Court, it appears that plaintiffs had executed a bond and mortgage to defendant in consideration that defendant would marry plaintiff's daughter. The marriage was performed. After defendant and the daughter had lived together for about two years she obtained a decree annulling the marriage on the ground of defendant's impotency. Thereafter plaintiffs brought their action in equity to obtain the cancellation of the bond and mortgage and ultimately a decree was rendered in their favor. The court held in substance that the decree annulling the marriage, in which case he appeared and defended, was conclusive against him in plaintiffs' present action that the marriage was void *ab initio,* that defendant had not complied with his agreement and that the bond and mortgage should be canceled because of failure of consideration.

In the Illinois case of *Butler v. Butler,* 161 Ill. 451, the decision is based upon similar principles. It is there decided (a) that a marriage between persons while in a state of slavery is not binding upon the parties to it if repudiated upon emancipation; (b) that

a second marriage by a slave after obtaining his freedom disaffirms a former marriage contracted in slavery and renders it null and void from the beginning; and (c) that the children of a marriage, contracted while the father was a slave and which marriage was disaffirmed by a second marriage after he became free, are incapable of inheriting from the father, and that the widow and children of such second marriage will inherit. The court said (p. 460, italics ours):

"Following the almost unbroken line of authorities on the question, we are of the opinion that the marriage of Allen Butler to Mariah Conway was lawful, and that she is his lawful widow. It follows that the complainant, Mary Ann Butler, has no interest in his estate. Upon well recognized legal principles it follows, also, that the disaffirmance of the slave marriage rendered it null from the beginning, *to the same extent* as would a decree of nullity rendered by a court of competent jurisdiction between parties incapable in law of contracting a valid and binding marriage, and made the issue of the slave marriage incapable of inheriting from the father, in the absence of any statute to the contrary."

Another contention of counsel for respondent, urged as a ground for reversal of the order of the circuit court, is that "the court has no power to order a widow's name placed upon a pension roll when the right of such widow to a pension *has been revoked by the legislature.*" Before discussing this contention we will set forth certain statutes passed by our legislature. When petitioner first made application for and was granted a widow's pension after March, 1926, in accordance with the then existing act of 1917, section 10 of that act, as amended in 1925, provided in part as follows (Cahill's St. 1927, ch. 24, ¶ 951, p. 515):

"If any fireman shall die from any cause while in the service, . . . , or if any fireman shall die from

any cause during retirement on account of disability or during retirement after 20 years' service and while in good standing, as provided in this Act, and shall leave a widow, . . . , said board of trustees shall direct the payment from such pension fund of the following sums of money monthly:

"(a) To such widow the sum of forty-five dollars per month; *provided,* that no pension shall be allowed to the widow of any deceased fireman who has married such fireman subsequent to the date of his retirement on pension; *and provided further* that the pension granted to the widow of any fireman shall cease *if such widow again marries. . . . "*

After petitioner's marriage to Mawson at Crown Point in April, 1928, had been annulled by the decree of the circuit court on June 6, 1930, and after petitioner had applied to the then Pension Board for the reinstatement of her name on the pension roll, and after the board had denied her application on the ground that the annulment did not render her said marriage to Mawson "void *ab initio* so as to entitle petitioner to be restored to the pension roll," but about a year before petitioner had filed her petition in this certiorari proceeding, our legislature passed a new and more comprehensive act, in force July 1, 1931, entitled "An Act to provide for the creation, setting apart, maintenance and administration of a firemen's annuity and benefit fund in cities having a population exceeding 500,000 inhabitants." By the act the old Pension Board was succeeded by the present Retirement Board, etc., respondent herein. In section 6 of the Act (Cahill's St. 1931, ch. 24, ¶ 941(6), p. 575) the powers and duties of the board are defined, and in subsection (g) the board is given power to consider and pass upon all applications for pensions, etc., including those arising under prior acts relating to pensions, etc. And it is in said subsection further provided:

"The retirement board shall have exclusive jurisdiction in all matters of claims under this Act, and its actions on such claims shall be reviewable by *certiorari* only."

In section 52 of the Act (Cahill's St. 1931, ch. 24, ¶ 941(52), p. 593) the act of 1917, as amended, is specifically referred to, and there are various provisions concerning claims for pensions, etc., arising under said old act. And at the end of said section it is stated:

"It is the intention of this section that any and all rights and benefits granted under the certain act entitled" (here is set forth the title of the act of 1917) "filed June 14, 1917, in force July 1, 1917, as subsequently amended, shall be continued, preserved and secured by and under this Act to all persons to whom such rights or benefits have accrued, or would or could have accrued under said latter Act, subject, however, to the limitation herein provided as to the payment of back pension."

In section 58 of the new act (Cahill's St. 1931, ch. 24, ¶ 941(58), p. 596), which is headed "Effect of remarriage of widow," the final clause is as follows:

"Neither divorce *nor annulment* of such subsequent marriage shall entitle such widow to a resumption of any annuity granted to her prior to such marriage."

Counsel for respondent rely upon this clause of section 58 in urging their instant contention. Stating the well settled principles of law that pensions are but bounties of the government, which may be given, withheld or recalled at the pleasure of the sovereign power, and that a pensioner has no vested legal right to his pension (see 22 Ency. Law, 2nd Ed., p. 658; *Eddy v. Morgan,* 216 Ill. 437, 449; *Frisbie v. United States,* 157 U. S. 160, 166) counsel argue in substance, as we understand the argument, that, even though petitioner's marriage to Mawson was annulled and be-

came "effaced as if it had never been" more than a year prior to July 1, 1931, when the new act became in force, said clause in section 58 discloses such a legislative intent as should prevent any resumption of petitioner's pension. We cannot agree with counsel's contention or argument, when consideration is given to the new act in its entirety and particularly to the provisions of section 52 thereof, as above outlined. We do not think that it was the legislative intent, where a subsequent marriage of a former widow pensioner had been held void and annulled long prior to the passage of the new act, and she was then entitled to a resumption of the pension, that in such a case she could not be considered as a proper pensioner. On the contrary we think that the legislative intent was to have such section 58 of the new act apply only to cases where the annulment of the subsequent marriage had been granted after the passage of the new act.

Counsel for respondent direct our attention to section 5 of the act of 1917, as amended (Cahill's St. 1927, ch. 24, ¶ 946, p. 514), wherein it is provided that the Pension Board "shall have power (a) to hear and determine all applications for pensions . . . under this Act, and its decisions in such matters shall be final and conclusive and not subject to review or reversal except by the board," and counsel further contend that because of this provision the circuit court erred in entering the judgment in question. In our opinion the contention is without merit. We understand it to be the law or practice that decisions of such boards in pension applications, etc., are subject to review in proper cases by the courts, particularly where they have acted arbitrarily, or under mistaken views of the law as in the present case. (See *Wilke v. Chicago,* 212 Ill. App. 414, 420.) Furthermore, our legislature, in subsection (g) of section 6 of said new

act of 1931 (Cahill's St. 1931, ch. 24, ¶ 941[6]), above mentioned, has recognized such law or practice, but has limited the review of actions of the Retirement Board in pension, etc., matters to "certiorari only."

After carefully considering the allegations of petitioner's petition, the pertinent statutes, the exhaustive briefs and arguments of respective counsel and many adjudicated cases, we have reached the conclusion that the circuit court did not err in entering the order or judgment appealed from, as first above mentioned, and accordingly the same is affirmed.

*Affirmed.*

Sullivan, P. J., and Scanlan, J., concur.