## ROBERSON v. McCAULEY.

HEIRS AT LAW—SLAVES—INHERITANCE.—THE CHILD of a former slave begotten in concubinage with a slave, and afterwards acknowledged by the father as his child, cannot inherit any part of his estate. *Acts 13 Stat., 31 or 291, 393 and 15 Stat., 183, considered. Davenport* v. *Caldwell,* 10 S. C., 338, and *Knox* v. *Moore,* 41 S. C., 355, *distinguished from this.*

Before HUDSON, J., special Judge, Anderson, December, 1900. Affirmed.

Action for partition by Amanda Roberson against Mary McCauley, William Edwards and John C. Osborne. R. Y. H. Nance, Esq., special referee, filed the following report, omitting formal parts:

"IV. The plaintiff introduced testimony to show that Abram McCauley, the late husband of Mary McCauley, the defendant herein, had one Mary Yarborough as his wife during the war and prior to 1865, and that Amanda Roberson was born to them as their child. And that the said Amanda Roberson visited Abram McCauley at his home in the city of Anderson, S. C., on several occasions, and that she was recognized by him as his daughter, and thereby entitled to inherit from his estate.

"V. The defendants introduced testimony to show that

Abram McCauley never had Mary Yarborough as his wife, but that he was married to Emily Scott. And that she was the only wife he had prior to 1868, when he was then married to the defendant, Mary McCauley, and resided with her until his death, in the spring of 1899, and that no children were born to Emily Scott and Abram, nor to Abram and Mary, his wife, at the time of his death.

"VI. After reviewing and considering the testimony very carefully, while it is very contradictory in many respects, and a great deal of it for the want of memory, as will be observed by the testimony of those who testified as to how long the war lasted, when Emily and Abram married, and how long before the war, and how long after the war, they lived together, when the fact is, according to Mr. I. H. McCalla's testimony, they may have been married as late as 1863 (referring to the battle of Battery Wagener, which was fought on July 18, 1863), and that they parted in Christmas, 1865, or January, 1866.

"Therefore, from the testimony, I find as matters of fact:

"I. That Abram McCauley visited Mary Yarborough prior to 1865, and while there occupied the relation of man and wife.

"II. That the said Mary Yarborough gave birth to a child in July, 1862, and that she was named Amanda, and that she is the plaintiff in this case.

"III. That Abram McCauley was married to Emily Scott, probably as late as 1863, and that there was no children born to them.

"IV. That Abram McCauley and Mary Keaton were married in 1868, and the said Abram McCauley and Mary McCauley lived together until his death in 1899, and no children were born to them.

"V. I find Amanda Roberson visited the said Abram McCauley at his home in the city of Anderson, S. C., on several occasions, and on one occasion that the said Abram McCauley gave the said Amanda Roberson a clock.

"VI. That the said Abram McCauley recognized the said

Amanda Roberson to be his daughter. And that Amanda called him pa and Mary ma.

"VII. The testimony does not satisfy my mind beyond a doubt that the said Amanda Roberson is the child of the said Abram McCauley, but from his acknowledgment of her being his daughter, I find the following conclusions of law: I. That the marriage of Abram McCauley and Mary Keaton, now Mary McCauley, and one of the defendants herein, was a legal and valid marriage. II. That it appearing that Amanda Roberson was born prior to the passage of the act of 1865, and I think it clear that she was recognized by the said Abram McCauley to be his daughter, thereby making the said Amanda Roberson a legal heir under the 4th section of the act of 1865, in which it declares, 'every colored child heretofore born is declared to be the legitimate child of his mother and also of his colored father, if he is acknowledged by said father.' *Knox* v. *Moore,* 41 S. C., pages 361-362. As stated before, I think the evidence shows that Abram McCauley recognized or acknowledged Amanda Roberson to be his child and, therefore, she is entitled to inherit from his estate. I would, therefore, recommend to the Court, that the premises described in the said complaint be sold for partition between the said Mary McCauley and Amanda Roberson, and that the said Mary McCauley be allowed to prove the debts, if there be any, of the said Abram McCauley, deceased, and after paying such debts and the costs of this action, that the surplus, if there be any, be divided between the said Mary McCauley and Amanda Roberson, according to their respective interests."

The Circuit decree is as follows, omitting formal parts:

"The case involves the construction and effect of those statutes in this State relating to the marital relations and issues of former slaves, and the statutes and decisions in the State relating thereto, were fully discussed by counsel in their arguments. In order to entitle the plaintiff to recover, she must establish her claim by the preponderance of the

evidence—by proof satisfactory to the Court. That will
depend upon two facts: 'First. Is plaintiff, as she alleges,
a daughter of the deceased, Abram McCauley? The testi-
mony on this question is conflicting, and leaves the question
in doubt. The special referee, while not satisfied beyond a
doubt that such was the case, bases his findings on the admis-
sion or acknowledgment by Abram McCauley that plaintiff
was his child. While, therefore, it is doubtful whether
Abram McCauley had a daughter by Mary Yarborough, in
the face of the statements testified to by several of the wit-
nesses that Abram McCauley had made to the effect that
plaintiff was his daughter, I am unwilling to disturb the
findings of the referee in that respect. We come, therefore,
to the question: Second. If plaintiff is a daughter of the
deceased, Abram McCauley, is she, under the facts proved
in this case, entitled to inherit from him? Did he recog-
nize her? I hold that he did. Under the statute, she would
clearly be entitled to inherit from the mother. Is this right
equally clear as to the estate of the father? The statute was
passed to meet the conditions that surrounded the newly
emancipated race. The legislature must have recognized
that, whether primarily through their own fault or by virtue
of conditions which they were practically powerless to com-
bat, the slaves had, prior to their emancipation, become
a lecherous race, and that want of chastity among their
women was notorious. But, notwithstanding this fact, even
among these degraded people, a clear distinction was recog-
nized between the marriage relations and mere concubinage,
and between lawful issues and bastards. At emancipation
these slaves entered upon new life, with new rights and en-
larged powers. Among these were the rights of legal mar-
riage and the right of property. The statute was intended
to regulate both these rights, and we must conclude that it
was intended to be construed, as far as possible, in the
interest of both industry and good morals: Abram McCau-
ley was, as the testimony shows, a slave, who, after his
emancipation, by industry and thrift accumulated property.

He had at the time of his death a wife, Mary McCauley, the companion of years of his toil. Under the view that I take of this case, the question now comes squarely upon the issue whether the laws of South Carolina will allow a mere bastard, the issue of concubinage prior to emancipation, to come in and share this property with the widow, upon the mere declaration by Abram McCauley in his lifetime that such issue was his child? Would not such a conclusion put on the statute a construction favorable to immorality, and a construction which the legislature never intended? If this were true, a negro who, under the low state of morals existing, especially just after the war, among them, boasted that a certain child was his, when no marriage relation had ever existed whatever with its mother, would thereby have entitled such issue to inherit from him along, perhaps, with his lawful wife and children, who may have shared in years of labor to accumulate the property in dispute. Our laws, in my judgment, do not give mere bastards such rights. If, therefore, Amanda Roberson, the plaintiff, is a mere bastard, the issue of a bald concubinage, she cannot inherit from Abram McCauley. A careful review of the evidence leads me to conclude that no kind of marriage relation, either legal or moral, ever existed between Abram McCauley and Mary Yarborough They never recognized or intended that such relation should exist between themselves; Mary Yarborough was never more to Abram McCauley, either morally or legally, than a mere concubine, and Abram McCauley, neither before nor since emancipation, has ever recognized any other relation. I hold, therefore, that the plaintiff is the issue of concubinage, and that she is not entitled to inherit from Abram McCauley. I recognize that no formal ceremony was necessary to create the relation of husband and wife; but as Abram McCauley and Mary Yarborough did not intend while cohabiting to be regarded as husband and wife, and did not so regard themselves, I hold that the issue of the relation cannot be made to inherit by the staement of the father that this issue was his own, as testi-

fied to in this case.   The act wisely enables children to in-
herit from their slave mothers, because the link that bound
in this case was certain; but the slave husband at freedom,
if compelled to recognize all the issues of his concubine, or
even the bastard issue of her who occupied to him the rela-
tion of wife, might have a burden fixed upon his efforts to
accumulate property, by being compelled to support children
that were not his own.   And one of the objects in the
acknowledgment clause of the act was evidently to protect
him against his own wife's bastards, and not to allow him
to prevent those who had no moral claim for his support
from coming in and inheriting the fruits of his labor.

"So far as the referee's report is in accordance with the
views herein expressed, it must be sustained, and so far as
in conflict herewith, it must be overruled, and so with the
exceptions.

"It is, therefore, ordered, adjudged and decreed, that the
complaint be dismissed, and that the plaintiff pay the costs
of this action."

From this decree the plaintiff appeals.

*Mr. E. M. Rucker, jr.,* for appellant, cites: 10 S. C., 317;
26 S. C., 270; 36 S. C., 454; 41 S. C., 355.

*Messrs. Bonham & Watkins,* contra, cite: 21 Stat., 291;.
41 S. C., 355; 33 S. C., 66; 36 S. C., 454; 10 S. C., 317; 16
S. C., 300.

August 20, 1901.   The opinion of the Court was deliv-
ered by

MR. CHIEF JUSTICE McIVER.   This was an action for
partition of a certain lot of land in the city of Anderson, of
which one Abram McCauley died seized and possessed, some
time in January, 1899.   He having died intestate, the only
question is as to who is entitled to inherit his estate.   The
plaintiff, in her complaint, alleges that "the said decedent
left surviving him as heirs at law, a daughter, the plaintiff,

by a former marriage, and his widow, Mary McCauley, one of the defendants"—the other two defendants, William Edwards and John C. Osborne, being persons who claim an interest in the said lot of land under the said Mary McCauley.

The defendants in their answer deny that the plaintiff is entitled to any interest, either as heir at law or otherwise, in the estate of the decedent, Abram McCauley, and, on the contrary, aver that he died leaving as his sole heir at law his widow, the said Mary McCauley, and that she alone is entitled to inherit his estate.

By consent, an order was passed referring the case to a referee to take the testimony and report his findings of fact and conclusions of law. The testimony so taken is set out in the "Case." The referee made his report, a copy of which is also set out in the "Case," and will be incorporated in the report of this case by the Reporter, and the case was heard by the Circuit Judge upon exceptions to the said report, who rendered a decree (which will likewise be embraced in the report of this case) dismissing the complaint. From this judgment the plaintiff appeals upon the several grounds set out in the record, which need not be set out here, as they practically raise but two questions. 1st. Did the Circuit Judge err in concluding as matter of fact that no marital relation, either legal or moral, ever existed between Abram McCauley and Mary Yarborough, the mother of plaintiff, but that such relation was one of mere concubinage? 2. Did he err in concluding as matter of law that the plaintiff having sprung from such an illegal relation, was not entitled to inherit from Abram McCauley, notwithstanding the fact that Abram acknowledged her as his child?

For a proper consideration of these questions it will be necessary to make a brief general statement of the facts out of which this controversy has arisen. Abram McCauley was a slave, and belonged to Col. George McCauley. Mary Yarborough was also a slave, belonging to Dr. Yarborough. During the war between the States, there is testimony tend-

ing to show that Abram visited Mary at the plantation of Dr. Yarborough, her master, not, however, with but against his consent, and apparently against the consent of his owner, Col. McCauley. We do not find any evidence that there ever was any pretense or even a moral marriage (as it is termed in the books), nor is there any satisfactory evidence that they ever recognized each other as man and wife, or lived together as such. On the contrary, the testimony of Col. Isaac McCauley, who was the son of Abram's owner, satisfactorily shows that, at some time during the war, when does not very clearly appear, though it must have been early in the war, Abram was formally married to another one of Col. Geo. McCauley's slaves, Emily Scott by name, with the consent of his owner—"they had a big wedding," at which this witness was present, and they lived together as man and wife on the plantation until about the close of the war, or perhaps shortly after the war ended. But without going into any detailed consideration of the testimony, which is all set out in the "Case" and has been carefully examined, it is sufficient for us to say that we agree with the Circuit Judge, "that no kind of marriage relation, either legal or moral, ever existed between Abram McCauley and Mary Yarborough," and that they never, either before or since emancipation, recognized or lived with each other as husband and wife, but that their relations towards each other was merely that of concubinage. The finding of the referee, which is claimed to be adverse to the conclusion which we have reached, is expressed in the following dubious language: "That Abram McCauley visited Mary Yarborough prior to 1865, *and while there* occupied the relation of man and wife." The words which we have italicized leave it at least doubtful, whether he meant to find that these persons lived as man and wife, or merely to say that *while on these visits* Abram *"occupied"* the same bed with Mary Yarborough; and if he meant the latter, that would be entirely consistent with the conclusion which we have reached. At all events, whatever may have been the meaning which the referee in-

tended to express by the dubious language which he used, we are entirely satisfied that the preponderance of the evidence is decidedly in favor of the view which we have adopted, and does not support the conclusion that these persons ever sustained to each other the relations of husband and wife. Inasmuch as both the referee and the Circuit Judge have found as facts, though manifestly with some hesitation, that the plaintiff was the issue of sexual intercourse between Abram McCauley and Mary Yarborough, and that Abram acknowledged the plaintiff as his daughter; and as there is no exception to these findings by the Circuit Judge, and no notice has been given of an attempt to support the judgment appealed from by controverting either of these findings of fact, we will assume them to be facts in the case, though we must add that there is much in the testimony which, if the question were open, would be well calculated to induce a different conclusion; or, at least, calculated to show that the plaintiff, upon whom was the burden of proof, had failed to establish by the preponderance of the evidence either of those facts, both of which were necessary to her right to recover.

But waiving this, for the reason above indicated, we will proceed to consider the question of law, as to whether the plaintiff, under the facts found by the Circuit Judge, was entitled to inherit any portion of the estate of the intestate, Abram McCauley. That question may be stated as follows: Whether the offspring, born during the existence of slavery, of an illicit connection between a man and a woman both of whom were slaves, who has been acknowledged by the man as his child, can, upon his death intestate, inherit any portion of his estate. During the existence of slavery, it was well settled in this State, at least, that marriage was a civil contract, and that slaves being incapable of contracting, they were incompetent even to enter into a contract of marriage, which the law would recognize as valid and binding upon the parties, giving rise to the rights and obligations which would attend a marriage between persons not laboring

under the disability to contract. But while this was the
well settled legal doctrine, yet it was a well known and uni-
versally acknowledged historical fact, that slaves of differ-
ent sexes were in the habit, during the existence of slavery,
of entering into such relations with each other, usually
with the consent of their owners, as followed from a legal
marriage between persons capable of contracting. Fre-
quently these relations between slaves were entered into by a
formal ceremony of marriage, while in other instances the
parties simply came together by agreement to live with each
other as husband and wife, and recognized by each as such.
These relations, when thus assumed between slaves, are
termed *moral* marriages, lacking only the power to contract
to make them *legal* marriages. When, therefore, the insti-
tution of slavery was abolished, the General Assembly of
this State, in view of the condition of things, on the 21st of
December, 1865, passed an act, entitled "An act to establish
and recognize the domestic relations of persons of color,
and to amend the law in relation to paupers and vagrancy,"
to be found in 13 Stat., at page 31 of the edition of the acts
of that year, which the writer of this opinion now has before
him—though we see that it is cited in the argument of
appellant's counsel as 13 Stat., at p. 291 (2d ed., vol. 13, p.
269), which we presume is the page of the other edition of
the acts of that year. The manifest object of that act, as
we think, was, amongst other things, to recognize as legal
the moral marriages above spoken of, and to declare legiti-
mate the offspring of such marriages, under the conditions
mentioned in the act. The act of 1866, entitled "An act to
declare the rights of persons lately known as slaves and as
free persons of color," passed the 21st of September of that
year, 13 Stat., 393 (2d ed., 366²⁹), which is sometimes
referred to as repealing the act of 1865 above cited, only
repeals such acts and parts of acts as are contrary to or
inconsistent with the provisions of the act of 1866, and the
last mentioned act deals only with the rights of persons
lately known as slaves or as free persons of color, prospec-

tively, whereas such portions of the act of 1865 as we think are applicable to this case, are retrospective, and have been so declared to be in the cases of *Davenport* v. *Caldwell,* 10 S. C., 317; *Clement* v. *Riley,* 33 S. C., 66; *Callahan* v. *Callahan,* 36 S. C., 454, and *Knox* v. *Moore,* 41 S. C., 355. Hence those portions of the act of 1865 which are applicable to this case, not being contrary to or inconsistent with the provisions of the act of 1866, cannot be regarded as repealed by that act. Indeed, we do not see that the act of 1866 has any application to this case.

We will next refer to the act of 12th of March, 1872, 15 Stat., 183, entitled "An act legalizing certain marriages, and for other purposes therein mentioned." That act was probably passed because of the express repeal of the act of 1865, above referred to, by the Rev. Stat. 1872, at page 842, which went into effect on the 10th of February, 1872. The first section of the act of 1872 provides: "That all persons in the State of South Carolina, who, previous to their actual emancipation, had undertaken and agreed to occupy the relation to each other of husband and wife, and are cohabiting as such, or in any way recognizing the relation as still existing at the time of the passage of this act, whether the rites of marriage have been celebrated or not, shall be deemed husband and wife, and be entitled to all the rights and privileges, and be subject to all the duties and obligations of that relation, in like manner as if they had been duly married according to law. Sec. 2. And all of their children shall be deemed legitimate, whether born before or after the passage of this act; and when the parties have ceased to cohabit before the passage of this act; in consequence of the death of the woman, or from other cause, all the children of the woman recognized by the man to be his, shall be deemed legitimate: *Provided, however,* That no provision of this act shall be deemed to extend to persons who have agreed to live in concubinage after their emancipation." The third section simply repeals all acts and parts of acts inconsistent with this act. This act was probably passed in view of the fact that

the act of 1865, hereinabove referred to, had just been repealed by the Rev. Stat. of 1872, thus leaving no statutory provision for the anomalous condition of those who had once been slaves, and had prior to their emancipation undertaken to enter into marital relations, which resulted in the birth of offspring, which though of no *legal force* and effect, simply because of the want of power in the parties to contract at the time such relations were assumed, ought, nevertheless, to be regarded as morally binding, and that the issue of such relations, if acknowledged as such, ought to be regarded as legitimate. The act of 1872 may, therefore, be regarded as a substitute for the provisions of the act of 1865 in respect to this peculiar condition of things, which act had been repealed. Under this view of the object of the act of 1872, it is quite clear that the conclusion reached by the Circuit Judge in this case is correct, that it was the intention of the legislature to declare only the issue of *moral* marriages to be legitimate, and capable of inheriting from their father as well as from their mother, and not to declare the issue of mere concubinage legitimate. The language of the first section of the act of 1872: "That all persons * * * who, previous to their actual *emancipation,*" shows clearly that the act applies only to persons who had once been slaves; and the subsequent language of that section shows with equal clearness, that it was intended only to apply to those who, while they were slaves, had undertaken to enter into marital relations, which, while not constituting *legal* marriages, did constitute what is termed in the decisions *moral* marriages; and the language of the second section of the act: "And all of their children"—that is, all of the children of such *moral* marriages—shall be deemed legitimate, manifestly shows that the provisions of the second section apply only to the children of such *moral* marriages. If, therefore, this case is to be determined by the provisions of the act of 1872, as we think it should be, we do not think there can be a doubt that the conclusion of law reached by the Circuit Judge is correct. It was the only law in force at the time

this controversy arose, and also at the time of the death of the intestate—the period to which we must look in determining who are his heirs at law, entitled to inherit from his estate (*Young* v. *Dinkins,* Rich. Eq. Cases, 23; *Glover* v. *Adams,* 11 Rich. Eq., 264; *Shaffer* v. *McDuffie,* 14 Rich. Eq., 146). It was in terms retroactive, and did not divest any vested rights, for *nemo est haeres viventis.* We see no reason why the act of 1872 should not be applied to this case.

But even if we are in error in this, and the case should be governed by the act of 1865, as it seems to be assumed in the argument, it must be, we are still of opinion that there was no error in the conclusion of law reached by the Circuit Judge under the facts as he found them, which finding we approve, so far, at least, as relates to the nature of the connection between Abram McCauley and Mary Yarborough. While it is quite true that the terms of the fourth section of the act of 1865, if looked at alone, might justify the conclusion contended for by the appellant; yet such conclusion involves the necessity of imputing to the legislature an intention to recognize and sanction a moral wrong by placing the offspring of mere concubinage upon the same footing as the offspring of a moral marriage—so far, at least, as the colored race is concerned—and thus discriminating between the colored and the white race in favor of the former. A conclusion involving such an imputation upon a co-ordinate branch of the government will not readily be adopted by the Courts. But when we examine the provisions of the fourth section of that act, in connection with the other provisions of the act, we find that such a conclusion is not forced upon us. As has been said above, the object of that act was to provide for the anomalous condition of things with which the people of this State were confronted, when, at the close of the war between the States, a very large proportion of the inhabitants of the State were suddenly converted from a condition of slaves into the condition of freemen. The legislature, therefore, very wisely undertook to provide for

the recognition of the family relation amongst that class of the inhabitants of the State, which though *morally* could not have been *legally* recognized, simply because of their want of power to contract a marriage, which constitutes the basis of the family relation. Hence we find that in the first section of the act, "the relation of husband and wife amongst persons of color is established," in express terms. In the second section it is declared that "those who now live as such, are declared to be husband and wife." In the third section of the act provision is made for the case of one man having two or more reputed wives, or one woman having two or more reputed husbands. Then follows the fourth section in these words: "Every colored child, heretofore born, is declared to be the legitimate child of his mother, and also of his colored father, if he is acknowledged by such a father." From the connection in which this language was used, we must conclude that it was intended to apply only to the children born of what have been termed *moral* marriages between persons who were slaves at the time they entered into such so-called marital relations, which it was well known existed among slaves prior to their emancipation, and from which large numbers of children had been born; and was not intended to declare every colored child legitimate, for in section 16 of the act, illegitimate colored children are expressly recognized. As was well said by the late Mr. Justice McGowan, in delivering the opinion of this Court in the case of *Clement* v. *Riley,* 33 S. C., at page 81: "We cannot think that it was the intention of any or all of the acts aforesaid [referring to the acts of 1865, 1866 and 1872] to attempt the impracticable thing of legitimizing the whole colored race, without the least regard to the circumstances under which they were born, including the offsprings of mere concubinage. As it strikes us, it could not have been the intention to create marriage relations which, in fact, never existed, so as to affect the rights of inheritance. The law does not undertake to make the marriage contract; that must be the act of the parties themselves, the law only

declares its consequences. As we understand it, the purpose was to remedy a case where the parties had agreed to occupy towards each other the relations of husband and wife—that is, a moral marriage, lacking only the power of contract to make it legal." This states the legal proposition for which we contend, and justifies the conclusion which we have reached.

Counsel for appellant in his argument relies upon certain language used by the Justice delivering the opinion of this Court, in *Davenport* v. *Caldwell,* 10 S. C., at p. 338, and again at p. 341, in support of his contention; but that language was a mere *dictum,* and not authority; for in that case there was a moral marriage between the persons under whom the parties claimed the right to inherit, and that case can only be regarded as authority for the proposition which we concede—that the issue of a moral marriage between persons who, at the time, were slaves, may inherit not only from their mother but also from their father, if acknowledged by him. So, also, he cites the case of *Knox* v. *Moore,* 41 S. C., 355, relying specially upon certain language used by the Justice who delivered the opinion of the Court, at p. 361-2. But in that case also there was a moral marriage, during the existence of slavery, between Thornton Moore and Rhindy, and it was of the right of the children of *such* marriage, who had been acknowledged by the father, to inherit his estate, or rather their portion thereof, that the learned Justice was speaking when he used the language relied upon. Of course, the language used by a Judge in delivering the opinion of the Court must always be construed with reference to the facts of the case which he is considering. While, therefore, the learned Justice, in that case, did hold (and rightly so) that the issue of the moral marriage between Thornton and Rhindy Moore, who were acknowledged by him, were entitled to inherit a portion of his estate, there is nothing in the language which he used that would even imply that he thought that the issue of a relation of mere concubinage between two persons while

slaves, where there was no pretense of a moral marriage, would likewise be entitled to inherit from their reputed father. We are, therefore, of opinion that there was no error in the conclusions, either of fact or law, reached by the Circuit Judge.

The judgment of this Court is, that the judgment of the Circuit Court be affirmed.