This was a proceeding for the determination of heirship in the matter of the estate of Frank McDade, Jr., deceased, and originated in the county court of Muskogee county.
Frank McDade, Jr., a minor Cherokee freedman, died intestate on the 26th day of June, 1915, leaving an estate consisting of approximately $7,500 in personal property; his own allotment; an allotment inherited by him from his deceased brother; an allotment inherited from his deceased mother; and a tract of land purchased for him by his guardian; and this case involves the question as to who inherits this property.
There are five sets of claimants to the estate, viz.:
Thomas H. Walker, who claims to be the maternal grandfather, and who bases his claim upon the alleged fact that in the Cherokee Nation from 1866 to 1898, custom marriages were recognized between freedmen in said nation, and according to this custom he and one Emily Pinder, commonly known as "Crippled Emily," lived together as husband and wife for a period of several years, during which time there was born to them a child named Mollie, who afterwards inter-married with Frank McDade, Sr., and who was the mother of Frank McDade, Jr.
Prince Tyner, who claims that he was the child of Andy Tyner and Rear Tyner; that his father, Andy Tyner, lived with Crippled Emily under the custom of the Cherokee freedmen, as her husband, and that Andy Tyner was the father of Mollie McDade, who was the mother of Frank McDade, Jr. Andy Tyner died intestate many years ago, and Prince Tyner claims to be the heir of Frank McDade, Jr., by reason of being a half-brother of Mollie McDade, Frank's mother, and claims to inherit by right of representation through his father. Annie Reed and Dave McDade, who claim to be the sister and brother of Frank McDade, Sr., and therefore the aunt and uncle of Frank McDade, Jr.
Henry Buffington, Stella Thornton, Robert Thornton, Sadie Welch, Alice Gordon, Kittie Foreman, Joe Thompson, Johnny Mackey, Henrietta Thornton, Seymore Johnson, Eunice Welch, and Lone Welch, who claim to be the next of kin of Frank McDade, Jr., because, they allege, he was illegitimate, his mother was illegitimate, and they are the grandchildren of Cynthia Brewer, who was the maternal grandmother of Mollie McDade, and great grandmother of Frank McDade, Jr.
William Tyner, who claims to be the son of Crippled Emily, and brother of Mollie McDade, and uncle of Frank McDade, Jr.
The county court decreed that Thomas H. Walker was the sole heir at law of Frank McDade, Jr. From this decree an appeal was taken to the district court of Muskogee county. After an appeal was lodged in that court. William Tyner died, and J.A. Tillotson and T.E. Elliott, executors of his will, were substituted as parties, and the interests of Addie Reed and Dave McDade were assigned to Carl B. Sebring and W.L. Moore, who have been made parties.
A trial de novo in the district court resulted in a decree reversing the judgment of the county court, and decreeing Prince Tyner to be the sole heir at law of Frank McDade, Jr., deceased. From this decree Thomas H. Walker, T.E. Elliott, surviving administrator of the estate of William Tyner, deceased, and the Buffington claimants have appealed.
It is admitted by all parties that Frank McDade, Jr., left no issue, father or mother, brother or sister, and no grandparents, unless Thomas H. Walker is his maternal grandfather.
The trial court made findings of fact and conclusions of law. Those findings of fact complained of by Walker, and necessary here to notice, are as follows: *Page 123 
"That Tom Walker, interpleader and one of the claimants herein for the estate of said Frank McDade, Junior, is a Cherokee freedman, and as such is enrolled as a member and citizen of the Cherokee Indian Nation or Tribe; that beginning about the year of 1876, and for about four years thereafter, the said Tom Walker, claimant herein, was living with his mother in a negro settlement, a short distance from the town of Fort Gibson, in the Cherokee Nation, Indian Territory, which settlement was commonly known as Frog Hill or Frog Town; that at that time the said Emily Pinder was living with her father, the said Dan or Daniel Pinder, near the said Frog Hill or Frog Town, and near the home of said Tom Walker and his mother; that frequently during said four or five years above referred to, and while the said Emily Pinder was living with her father, the said Tom Walker, and one Andy Tyner, who afterwards lived with said Emily Pinder as her husband, and several other negro men were frequent visitors at the Pinder home, and were there visiting the said Emily Pinder, and each and all of them frequently had sexual intercourse with her, but that during said time, to wit, from 1876 to 1880, none of said negro men were living in the same house with the said Emily Pinder or living with her as husband and wife; that said Tom Walker was never the husband by custom marriage or otherwise of said Emily Pinder; never lived in the same house with her for any considerable length of time and never lived with her as husband and wife; that the said Emily Pinder never at any time took the name of the said Tom Walker and never was known by the name of Walker; that no legitimate child was ever born to said Tom Walker and Emily Pinder; that during the time that said Tom Walker was having sexual intercourse or sexual relations with the said Emily Pinder, he was having like relations with one Rachel Payne, who, about the year 1880, bore a child by him, the said Tom Walker, which child was named Clark Walker or Grundy Walker, and was recognized by sold Tom Walker as his son: that subsequently the said Tom Walker lived for about two years with and in the same house and had sexual intercourse and sexual relations with a woman by the name of Addie Curtis; that the said Tom Walker never lived with said Addle Curtis as husband and wife and never considered the said Addle Curtis as his wife: that his relations with the said Emily Pinder and the said Addle Curtis were illicit: and that he lived with both of them in the same way, except that he lived for a considerable length of time in the house with the said Addle Curtis; that he never secured a divorce from either the said Rachel Payne, Emily Pinder, or Addle Curtis, and that thereafter, about the year of 1886, or prior thereto, he was married to one Dina Crapoe, his present wife, and has had two children by her, the oldest being born about 1887, and the youngest about 1890; that the said Dina Crapoe took the name of Walker from the said Tom Walker at the time she first began living with him and still bears that name, and is still living with him and bears his name; that some years after said Tom Walker and Dina Crapoe began living together and after children were born to them, the said Tom Walker and the said Dina Crapoe were legally married as required by law."
"(7) That Andy Tyner and Emily Pinder began to live together as husband and wife in what was recognized at that time in the Cherokee Indian Nation as a custom marriage about the year of 1880 or 1881; that they held themselves out as and were recognized in the community in which they lived, as husband and wife, and Emily took his name and was known thereafter as Emily Tyner; that their marriage at that time and until the death of Andy Tyner several years later was what was recognized in the Cherokee Nation as a custom marriage; that about one year after they began to live together as husband and wife, to wit, about the year 1882, a child was born to them which was named Mollie Tyner, that said Mollie Tyner was known and recognized by said Andy Tyner and Emily Tyner as their daughter; that she was known as Mollie Tyner until July, 1897, when she was married, legally, to Frank McDade, Senior, and that thereafter she became the mother of Frank McDade, Junior, now deceased, and whose property is the subject of this suit; that, besides Mollie Tyner, Andy Tyner and Emily Tyner had the following children, to wit: Charlotte Tyner, who died about September 30, 1908, and who was married to Isom Maxwell, who is now living, and from the marriage one child was born, which died quite young, without having been married and without issue.
"(8) That said Emily Pinder, the wife of Andy Tyner, and the daughter of Dan Pinder, had two illegitimate children of unknown paternal parentage, born to her prior to the time she began living with Andy Tyner, the first being Cynthia or Cinda, who was born before the year 1880, and died without being married and without issue about the year of 1881 and the second being Daisy, who was born about the year of 1880 and died without being married and without issue, about the year of 1883: that the said Emily Tyner after she had lived with Andy Tyner had the following illegitimate children born to her the first being Dan, of unknown paternal parentage, who was born some time about the year of 1890, and died while a boy without being married and without issue; the next being Willie or William, of unknown paternal parentage, and who was born in 1896, the enrollment showing him to be five years old in April, 1901, and is one of the claimants in this *Page 124 
action, and died about a year ago, and his administrators have been substituted for him in this action; that the next is George, and the next Henry, whose father was W. or Willie Williams, commonly known as W., who was never married to Emily Tyner by custom marriage or otherwise; and the said children George and Henry were illegitimate children of said Emily Tyner and both died while children without being married and without issue; that said W. or Willie Williams 'was not a Cherokee citizen, but was what is known as a states' negro.
"(9) That Prince Tyner is a Cherokee freedman and one of the claimants herein, is the son of Andy Tyner and Rear Tyner, who were married, and is the half brother of said Mollie Tyner McDade; that Prince Tyner had a brother, John Tyner, the son of Andy Tyner and Rear Tyner, who died many years ago leaving a wife, Sarah, who is now dead, and four children, as follows: John H. Tyner, one of the claimants herein; Ada Tyner, one of the claimants herein; Daniel Tyner, one of the claimants herein; and Della Tyner, who is now dead, leaving no children, but left a husband now living named John Sanders; that Ada Tyner, Daniel Tyner, and John H. Tyner are cousins of Mollie Tyner, and second cousins of Frank McDade, Junior, deceased, and were all Cherokee freedmen.
"(10) That William Tyner, one of the claimants herein, was a Cherokee freedman and was the child of Emily Tyner and not the child of Andy Tyner, and was the half brother of Mollie Tyner and an uncle of Frank McDade, Junior, deceased; that said William Tyner died since the filing of this suit and his administrators have been substituted in his stead in this action."
The court then concluded as a matter of law that Prince Tyner was the next of kin of the nearest degree of Frank McDade, Jr., deceased, and as such inherited all of the property of which he died seized.
Walker contends that the aforesaid findings are against the clear weight of the evidence; that the evidence conclusively shows that the relation of husband and wife under the custom prevailing in the Cherokee Nation existed between him and Crippled Emily for a period of several years and that, Mollie McDade was their child born during the time such relationship existed. The trial court found that custom marriages existed among freedmen of the Cherokee Nation at the time in controversy. That such custom marriages were valid has been repeatedly held by this court. Fender et al. v. Segro,41 Okla. 318. 137 P. 103: Chancey v. Whinnery, 47 Okla. 272,147 P. 1036: Butler v. Wilson. 54 Okla. 229, 153 P. 823; James v. Adams, 56 Okla. 450, 155 P. 1121; Crickett v. Hardin,60 Okla. 57, 159 P. 275; Lindsey v. Jefferson, 68 Okla. 156,172 P. 641; Johnson v. Dunlap, 68 Okla. 216, 173 P. 359; Coleman v. James, 67 Okla. 112, 169 P. 1065; Hughes v. Kano,68 Okla. 203, 173 P. 447; Meagher v. Harjo, 72 Oklahoma,179 P. 757; But the trial court found that Walker was never the husband of Emily Pinder, and that no legitimate child was ever born to them. Many witnesses testified on behalf of Walker, and from the testimony of some of them it might reasonably be inferred that Tom Walker and Crippled Emily lived together as husband and wife and that Mollie, the mother of Frank McDade, Jr., was their child. Tom Walker himself testified that he began living with Emily in about 1876, and that they lived together until 1880, 81, or 82, when Emily went to Kansas; that they had two children, Daisy and Mollie; that Daisy died before Emily went to Kansas; that Emily took Mollie and a child named Cinda to Kansas; that Cinda's father was July Smith; that after Emily returned from Kansas she and Andy Tyner lived together. On cross-examination, he testified that Emily had but two names, Emily Pinder and Emily Tyner; that on her return from Kansas, she went by the name of Tyner. He further testified that after Emily went to Kansas he lived with Addie Curtis for about two years; that he lived with her in the same way that he did with Emily, but did not have any children; that they lived in the same house, but that he did not consider Addie his wife. He further testified that Rachel Payne had a child by him who was called Clark Walker, but that Rachel Payne was not his wife; and in testifying as to the manner he and Emily lived together, he said that he lived with his mother near Emily's home part of the time, and would go across and see Emily. When asked whom he put on the 1880 rolls as his wife, he testified that he was not married then, though he claimed to have lived with Emily from 1876 to 1880, '81, or '82, and that Mollie was born in 1881 or 1882. He further testified that when Dina Crapoe, his present wife, began living with him, she assumed the name of Walker.
The testimony of the witnesses on behalf of Prince Tyner was to the effect that Crippled Emily had never been known as the wife of Tom Walker; that she was known as the wife of Andy Tyner, and bore his name.
There was introduced in evidence by Prince Tyner, a certified copy of the testimony of Emily Tyner, taken before the *Page 125 
Commission to the Five Civilized Tribes, upon her application for enrollment as a Cherokee freedman on April 3, 1901, wherein she testified that her name was Tyner, that her husband's name was Andy Tyner, and that he was dead. There was also introduced a certified copy of the testimony of Mollie McDade, taken before the Commission to the Five Civilized Tribes on her application for enrollment as a Cherokee freedman on April 4, 1901, which shows that she then testified that she was 19 years of age; that her father's name was Andy Tyner and her mother's name Emily Tyner. These copies were admitted over the objection of Tom Walker, and it is now contended that the trial court erred in this regard. In support of this contention, counsel cite the cases of Hughes v. Watkins, 75 Okla. 166,173 P. 369; Grayson v. Durant, 43 Okla. 799, 144 P. 592; Smith v. Bell, 44 Okla. 370, 144 P. 1058; and Lauderdale v. O'Neill, 74 Oklahoma, 177 P. 113.
Hughes v. Watkins, supra, is the only one of these cases involving the question of pedigree. This was an opinion by Galbraith, Commissioner, and it was there held that section 5112, Rev. Laws 1910, making "exemplifications from the books of any of the departments of the government of the United States, or any paper filed therein," admissible in evidence "in the manner and with like effect as the originals, when attested by the officer having the custody of such originals," makes such certified copies admissible only in cases where the original record would be competent and admissible.
In that case, a copy of the enrollment record was offered in evidence, and the census card, which was a part of such record, contained a pencil notation which it was the evident desire of counsel to get in evidence, and which was excluded by the trial court. The commissioner, in the body of the opinion, used the following language:
"It is apparent that the principal object of this offer was to get in evidence a certain pencil notation made upon the census card as follows: 'Lucy is a daughter of Governor Nero (deceased) on North Fork C. Roll.' This record was not competent evidence upon the issue of pedigree for which it was offered. The pencil notation upon the card above quoted, reciting the pedigree would have had little, if any probative force as evidence, if it had been admitted, but it was incompetent for any purpose and was properly excluded."
As to whether or not the case was properly decided, we express no opinion, but we disapprove of that language used wherein it is indicated that the enrollment record was not competent evidence upon the issue of pedigree. This court has repeatedly held that upon the question of marriage or non-marriage of Indians, it was not error to admit in evidence a certified copy of the application for enrollment of an alleged child of the marriage, including the affidavit of the mother before the Commission to the Five Civilized Tribes (Johnson v. Perry, 54 Okla. 23, 153 P. 289; Warren v. Canard,30 Okla. 514, 120 P. 599; Jefferson v. Lindsey, 68 Okla. 156,172 P. 641), and in Bell v. Bearman, 37 Okla. 645,133 P. 188, it was held that where the grantor's mother and sister were dead at the time of trial, it was not error to admit in evidence their affidavits as to the age of the grantor, made long before the execution of the deed whose validity was disputed.
That pedigree may be proved by hearsay testimony is well settled, and evidence of declarations of particular facts, such as births, marriages, and deaths, made ante litem motam, by persons since deceased who from their situation were likely to know, is admissible when the person making the declaration was related by blood or affinity with some branch of the family the pedigree respecting which was in question. Jones on Evidence, sec. 312; Wigmore on Evidence, sec. 1481.
In the case at bar, it is conceded that Mollie McDade was the mother of Frank McDade, Jr., and that Emily Tyner was his grandmother, and it is stipulated that they were dead at the time of the trial. This testimony before the Commission to the Five Civilized Tribes was given before there was anything to throw doubt upon it, and at a time when there was no incentive to testify falsely. In our opinion, these statements fall squarely within the rule announced, and, while not conclusive, should be given great weight.
These declarations were made under oath, and became a part of the records of the Commission to the Five Civilized Tribes, a department of the government of the United States, and copies thereof duly certified by the proper officer were admissible in evidence under the provisions of sec. 5112, Rev. Laws 1910. The other record evidence introduced was of very little probative force, and as the facts disclosed by such records were also shown by the testimony of witnesses, the error, if any, in admitting such records was harmless.
The evidence in many respects was in conflict, but the trial judge was in a position to observe the demeanor of the witnesses *Page 126 
and to judge of the truthfulness of their statements, and as an examination of the record does not satisfy us that the findings of fact and judgment are clearly against the weight of the evidence, the same will not be disturbed, for it has been uniformly held by this court that in an equity case this court will not disturb the judgment of the lower court, unless the same is clearly against the weight of the evidence. Nowka v. West, 77 Okla. 24, 186 P. 220; Prowant v. Sealy,77 Okla. 244, 187 P. 235; Swan v. Duncan, 78 Okla. 305, 190 P. 678; Parks v. Sinai Oil Gas Co., 83 Okla. 295, 201 P. 517.
It is next urged that the district court was without jurisdiction to hear this cause and reverse the judgment of the county court for the reason that said cause involved the determination of questions of fact, and was instituted and prosecuted under section 6488, Rev. Laws 1910, and in order to appeal from the judgment of the county court, appellants must have filed motions for a new trial in that court, which they did not do. This contention is without merit. Section 6488, Rev. Laws, supra, provides that: "An appeal shall be taken in the manner and to the court provided by law in cases of appeal in probate matters generally. The time and mode of taking such appeal, and of perfecting the same, and the undertaking on appeal, and all other matters of procedure governing the same, shall be the same as provided by law governing other appeals in probate matters."
Section 16 of art. 7 of the Constitution provides that all cases appealed from the county court to the district court shall be tried de novo in the district court upon questions of both law and fact. See, also, In re Lewis' Estate (Hobbs v. Wiley), 81 Okla. 240, 193 P. 341. It is unnecessary to file a motion for a new trial where the case is tried de novo in the appellate court. Sections 6505 and 6506, Rev. Laws 1910, provide that an appeal must be made by filing a written notice thereof with the judge of the county court, stating the judgment, decree or order appealed from, or some specific part thereof, and whether the appeal is on a question of law or fact or of both, and if of law alone, the particular grounds upon which the party is entitled to rely on his appeal, and by executing and filing within the time limited by section 6504 bond in such sum as the judge of the county court shall require, and conditioned as required by section 6506, supra. This procedure was followed in this case, and was all that was required.
Walker further contends that the trial court erred in refusing to follow the statutory procedure in trying his claim separate from the claims of the others; in requiring him to take the lead in the case, and in refusing to permit his counsel to cross-examine in full witnesses of the claimant Prince Tyner.
At the beginning of the trial, the court ruled that the witnesses of Tom Walker would be heard first. This was objected to by counsel for Walker, and after considerable argument by counsel the court said:
"The court wishes to state to all counsel concerned that the court does not agree with counsel for Tom Walker as to the order the court will or will not and can or cannot do in consideration of this case and wishes to further state that the court will not hold that Tom Walker is charged with the burden of proof in this case, and that the case will not be considered at the end of the testimony for or against Tom Walker as closed or in any way decided unless the court is absolutely convinced that Tom Walker is the sole and only heir. I am here to decree an heir of this estate, but in that event, judgment will be rendered for Tom Walker. If the court cannot at the end of this — at that point reach that conclusion, then the other contestants will be required to make and prove in the order as heretofore indicated by the court on the line of eliminating those who claim to be the nearest heir of Frank McDade. Now, are there any further exceptions?"
By the provisions of section 6488, supra, any person claiming to be an heir of the deceased may file in the county court a petition in the matter of the estate of such deceased person, praying the court to ascertain and decree the rights of all persons to said estate; the party filing such petition, if he files a complaint, and if not, the party first filing such complaint, shall in all subsequent proceedings be treated as the plaintiff therein, and all other parties appearing therein shall be treated as defendants. The Buffington claimants filed the petition provided for, which may properly be treated also as a complaint. Tom Walker afterwards filed what was denominated an "intervention," but which was in effect an answer to the complaint of the Buffington claimants, therefore, the Buffington claimants should have been treated as plaintiffs in the case. While it was improper to require Walker to introduce his evidence first, yet, as the court announced that he did not place the burden upon Walker, we are unable to see in what manner this erroneous procedure was prejudicial to Walker. *Page 127 
The matter of the mere order in which proof is introduced rests very much within the sound discretion of the trial court, and unless it clearly appears that this discretion has been abused to the injury of the complaining party, a case will not be reversed on this ground. Gower et al. v. Short, 36 Okla. 30,127 P. 485; Stetler v. Boling et al., 52 Okla. 214,152 P. 452; Barricklow et al. v. Boice et al., 50 Okla. 260,150 P. 1094; Lamont Mercantile Co. v. Piburn, 51 Okla. 618,152 P. 112; Wilson v. Moran, 82 Okla. 34, 197 P. 1051.
It will be observed that the Buffington claimants, the original petitioners, were eliminated by the decision of the trial court, and we fail to see how Walker could have been benefited by requiring them to introduce their evidence first. It is not claimed that Prince Tyner, the successful party, should have been required to introduce his evidence first. We cannot say that the court abused its discretion to the injury of Walker.
Counsel for Walker complain of the action of the trial court in limiting them in their cross-examination of witnesses for Prince Tyner where such witnesses had been cross-examined on the same subject by counsel for the Buffington claimants.
There were five sets of claimants, all claiming to be the sole heirs of Frank McDade, Jr., each set of claimants represented by several attorneys. It appears from the record that the witnesses for Tom Walker were cross-examined first by counsel for Prince Tyner; that when witnesses for Prince Tyner were introduced, counsel for Tom Walker desired to cross-examine last. This was permitted by the court, and counsel for Walker was permitted to conduct a lengthy cross-examination of the first two witnesses. The third they did not ask to cross-examine. When the fourth witness had left the stand the court suggested that counsel for Tom Walker cross-examine first, but counsel objected to this, insisting that they be permitted to cross-examine last, whereupon the court stated that he conceded the position of counsel, and permitted them to cross-examine last, under the condition that they not repeat the examination or cross-examination made by other counsel in the case, whereupon the following colloquy between court and counsel took place:
"By Mr. Moon: Did I understand the court to rule that I haven't got the right to cross-examine this witness on the same matter that Mr. Brown has gone over?
"By the Court: The court's ruling is this: That at your request the court decided that we should hear the answer or answers of Tom Walker's case before we proceeded with the rest of the hearing and that this witness is not appearing for Mr. Brown's clients and has been cross-examined by Mr. Brown after you had refused to cross-examine the witness first and that the court does not care to hear you cross-examine the witness on the same cross-examination that Mr. Brown has made. In other words, in order to avoid repetition, the court offered to let you cross-examine the witness first, and you have refused, and the court sees no reason why you should repeat the cross-examination already made * * *
"By Mr. Moon: I desire to call the attention of the court to the fact that when Mr. Brown asked the witness he attempts to break down Tom Walker's case.
"By the Court: I suggest that is the reason you should first examine, and I will limit Mr. Brown to matters not brought out by you. I have tried to conduct — to favor you in every way possible — and you seem determined not to permit me to do it. * * *
"By Mr. Moon: You refer to the suggestion that I examine prior to Mr. Brown?
"By the Court: Yes.
"By Mr. Moon: Except."
Counsel for Walker insist that the action of the trial court in not permitting them to cross-examine fully on every phase of the case developed on direct examination was error, and cites cases to this effect, among which are People v. Billis, 110 N. Y. Supp. 387 (a criminal case), and in re Kassons' Estate,59 P. 950 (a California case), in many respects similar to the case at bar, wherein the court held that it was prejudicial error to refuse to allow a party to cross-examine a witness at length, concerning her alleged marriage with testator, etc., though another party to the proceeding had cross-examined her on such matter, since in such proceedings the person who appears either by complaint or answer and claims heirship is an independant party to the action; but in the body of the opinion, after a discussion of the facts, the court said:
"Of course, in a proceeding under section 1664, when there are numerous parties, a court could, in its discretion, prevent *Page 128 
frequent and apparent useless repetition of the same questions by different parties; but the rulings of the court in the case at bar, above set forth, as presented by the record, cannot be justified on that ground."
In the case at bar, there were numerous parties represented by different counsel, and the statements of the court indicated that he was merely seeking to prevent frequent and apparent useless repetitions of the same questions by different parties. We do not think this was an abuse of discretion. The adjudicated cases are practically uniform in holding that it is within the discretion of the trial court to refuse to permit cross-examination calling for a repetition of testimoy given on direct or cross-exmination. Ferris v. Shandy, 71 Oklahoma,174 P. 1060; People v. Rader (Cal.) 68 P. 707; Cowart v. State (Ala.) 65 So. 665; Richardson v. State (Ark.) 96 S.W. 752; Hoover v. State (Ind.) 68 N.E. 591; Hughes v. Ward (Kan.) 16 P. 810; Gilliam v. Davis (Wash.) 44 P. 152; Waterbury v. Chicago, M. S. P. R. Co., (Iowa) 73 N.W. 341; Washington v. State (Tex.) 79 S.W. 811; State v. Kebler (Mo.) 128 S.W. 721; Beadle v. Paine (Ore.) 80 P. 903; McCherry v. Snare Triest Co., 114 N.Y. Supp. 674; State v. Burriss (S.C.)67 S.E. 306; Murphy's Executors v. Hoagland (Ky.) 107 S.W. 303; McLeod v. Wilson (Ga.) 33 S.E. 851. This rule peculiarly applicable in the instant case, in view of the fact that the court suggested that counsel for Walker first examine the witnesses, which they refused to do. Had they seen fit to do this, their cross-examination would, no doubt, not have been limited, but having refused to proceed in the manner suggested by the court, which would have afforded them full cross-examination, they ought not be heard to complain of the court's action in refusing to permit them to indulge in useless repetitions of practically the same questions asked the witness by other parties.
It is apparent that there was some friction between the court and counsel for Walker during the progress of the trial; as to the cause of this friction we are not advised, and it is immaterial. The only question with which we are concerned is, whether or not Walker was prejudiced by the rulings of the court, and whether a fair trial was had, and an examination of the record fails to convince us that the procedure adopted at the trial or the court's rulings during the course of the trial resulted in a miscarriage of justice, or constituted a substantial violation of any constitutional or statutory right of Walker.
By the provisions of section 6005, Rev. Laws 1910, a judgment will not be set aside or a new trial granted on account of error in the matter of procedure, unless after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right.
At the trial, after cross-examining several adverse witnesses, after having asked them if they testified to certain facts in the county court upon the former hearing of the cause, and having read such questions and answers from the transcript of the testimony taken in the county court, the witnesses having denied that they so testified, counsel for Walker offered in evidence a transcript of the witnesses' entire testimony for the purpose of impeachment. The court denied this offer, and it is insisted that this was prejudicial error. The court did not err in this regard. Only that part of the former testimony of a witness which was inconsistent with his present testimony was necessary or proper to be shown by the party seeking to impeach him 40 Cyc. 2751.
It is contended by the plaintiff in error, Walker, the Buffington claimants, and T.E. Elliott, administrator of the estate of William Tyner, deceased, that Prince Tyner can in no event inherit the estate of Frank McDade, Jr., because he was born in slavery of slave parents who never, after freedom, lived and cohabited together as husband and wife.
The authorities are almost uniform in holding that persons in slavery were incapable of contracting marriage, and the offspring of such persons have no inheritable blood. Hall v. United States, 92 U.S. 27, 23 L.Ed. 597; Cantelou v. Doe ex dem. Hood, 56 Ala. 519; Scroggins v. State, 32 Ark. 205; Andrews v. Simmons, 68 Miss. 732, 10 So. 65; Keen v. Keen, 184 Mo. 358, 83 S.W. 526; Tucker v. Bellamy, 98 N.C. 31,4 S.E. 34; Robertson v. McCauley, 61 S.C. 411, 39 S.E. 570; Gilbert v. Edwards, 32 Tex. Civ. App. 460, 74 S.W. 959; Johnson v. Shepherd, 143 Ala. 325, 5 A. E. Ann. Cas. 143; Jones v. Jones, 234 U.S. 614, 58 L.Ed. 1500, 3 R. C. L. 724. This for the reason that marriage is based upon contract, and slaves had no such freedom or right as Would enable them to contract. They were merely property, and as was said in Jones v. Jones, supra:
"They cannot take property by descent or purchase, and all they find and all they *Page 129 
hold belongs to the master. They cannot make lawful contracts, and they are deprived of civil rights. They are assets in the hands of executors for the payment of debts. 2 Kent, Com. (11th Ed.) 278 — 253. Jackson ex dem. People v. Lervey, 5 Cow. 397. Therefore, were not within the meaning and effect of the statutes of descent, and no descent from or through a slave was possible except as provided by some special statute. The rule was the same as to aliens and illegitimates."
Counsel for Prince Tyner assert that in view of the fact that the presumption of legitimacy is one of the strongest presumptions known to the law, it cannot be inferred from the evidence that Prince Tyner was a child of slave parents if such fact would make him illegitimate.
It is undoubtedly true that every presumption will be indulged in favor of legitimacy. Locust v. Caruthers,23 Okla. 373, 100 P. 520; Crickett v. Hardin, 60 Okla. 57,159 P. 275; Chancey v. Whinnery, supra; Lewis v. Lewis, 60 Okla. 60,158 P. 368; Thomas v. James, 69 Oklahoma, 171 P. 855.
In Chancey v. Whinnery, supra, which is the leading case in this state upon the subject, it was held that when a marriage in fact has been shown, the law raises the presumption that it is valid, casting the burden upon him who questions it to establish its invalidity; but was the marriage of Prince Tyner's parents shown? He testified, in substance, that his parents were slaves; that he was born in 1862; that his parents were married before or during the war; that his father ran away to the North; that his mother was taken South, and that his father and mother never again lived together.
It is conceded that slavery existed in the Cherokee Nation at the time of Prince Tyner's birth, and in Hall v. United States, supra, it was held to be an inflexible rule of the law of African slavery, wherever it existed, that slaves were incapable of entering into any contract, not excepting the marriage contract. Therefore, Prince Tyner's own testimony showed that his parents were incapable of entering into the marriage contract at any time before his birth, and that they did not live or cohabit together as man and wife at the time of or after emancipation. This was sufficient to overcome the presumption of legitimacy.
In order for a marriage between slaves to have any effect after emancipation, they must have lived and cohabited together as man and wife thereafter. Kennedy v. Pawnee Trust Co.,34 Okla. 140, 126 P. 548, and cases there cited.
We are forced to the conclusion that Prince Tyner was incapable of inheriting, unless he became legitimate by virtue of some curative act, and in this connection it is urged that the following portion of art. 9 of the Cherokee Treaty of July 19, 1866, rendered legitimate the issue of slave marriages:
"That the Cherokee Nation further agrees that all freedmen, who have been liberated by voluntary acts of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the Rebellion and are now residents therein who may return within six months, and their descendants, shall have all the rights of native Cherokees."
Counsel say that one of the rights of the native Cherokee was to be the heir of his father. That was true, if he was a legitimate child of his father, but was not true if he was illegitimate, for the illegitimate child of a native Cherokee could not inherit from his father. By the provisions of this treaty, freedmen and their descendants were granted all the rights of native Cherokees; therefore, they had the right to reside in and own property in the Cherokee Nation; they had the right to contract and enter into the marriage relation, and had the parents of Prince Tyner lived and cohabited together as man and wife after emancipation, this would have had the effect of transmuting the slave marriage, if one existed, into a legal one, and would have rendered legitimate their offspring, but, according to Prince Tyner's own testimony, this they did not do.
It is next urged that if Prince Tyner was not already legitimate, he became so by virtue of the provisions of sec. 38 of the act of Congress of May 2, 1890, establishing the Indian Territory, a portion of which section provides:
"Provided, that all marriages heretofore contracted under the laws or tribal customs of any Indian Nation now located in the Indian Territory are hereby declared valid and the issue of such marriages shall be deemed legitimate and entitled to all inheritance of property or other rights, the same as in the case of the issue of other forms of lawful marriage."
In our opinion, this act had no application to slave marriages. It referred to marriages theretofore contracted under the laws or tribal customs of any Indian Nation. Slaves were incapable of contracting *Page 130 
marriages under either the laws or tribal customs; they had no capacity to contract.
It is further insisted that if Prince Tyner was not already the legitimate child of Andy Tyner, he became such under the laws of Arkansas, which were in force in the Indian Territory up to the time of statehood, and which were continued in force thereafter as to all existing rights by sec. 1 of the Schedule to the Constitution of this state, and there is cited as authority for this contention Gregley v. Jackson et al.,38 Ark. 487.
That case would be decisive, if the act there under consideration had been extended over the Indian Territory. Only certain specific laws of the state of Arkansas were extended over the Indian Territory, one of them being chapter 103 of Mansfield's Digest of the Statutes of Arkansas, sec. 4590 of which reads:
"Marriage is considered in law a civil contract, to which the consent of the parties capable in law of contracting is necessary."
And sec. 4609 thereof is as follows:
"The marriage of all persons of color, who now live together as husband and wife, are hereby declared to be legal and their children legitimate."
This latter section of the statute was the first section of the act of December 20, 1866, of which the court in Gregley v. Jackson, supra, said:
"By the first section of an act passed December 20th, 1866, it was declared that the marriages of all persons of color, then living together as husband and wife, were valid, and their children legitimate. This was, at once, felt to be a very incomplete settlement of the question of inheritance. There were many thousands of men in the state belonging to the emancipated class, who were the offspring of former quasi marriages, which no longer existed when the law was passed, whose relations might acquire property and die intestate. The law did not apply to such cases, of which this is one. To meet such cases, and to provide a more general and uniform system of inheritance, a law was drafted by one of the present members of this court, then a member of the Legislature, which was passed on the sixth of February, 1867. By the third section it was amongst other things, provided, that in all cases where negroes or mulattoes have 'heretofore been so cohabiting, as husband and wife, and may have offspring recognized by them as their own, such offspring shall be deemed in all respects legitimate, as fully as if born in lawful wedlock."
The act of February 6, 1867, was never incorporated in Mansfield's Digest of the Statutes of Arkansas, and, of course, was never in force in the Indian Territory, and it is obvious that section 4609, supra, did not apply to cases like this. The parents of Prince Tyner were not living together as husband and wife at the time the act was passed, but they had long prior thereto separated, so this section of the statute does not aid Prince Tyner.
We are unable to see wherein the Thirteenth amendment to the federal Constitution, abolishing slavery, had the effect of legitimating the offspring of slaves. It merely prohibited slavery. As between the federal and state governments, the power to control and regulate marriages is retained by the latter. The Legislature of each state has the power and authority to prescribe the qualifications of the contracting parties, the forms or proceedings essential, the duties and obligations created, and the effect of marriage upon property rights. It also has power to validate or confirm by statute imperfect or voidable marriages, and the right of inheritance is governed solely by the laws of the state.
Prince Tyner further claims that as the evidence shows that Andy Tyner took him into his home, acknowledged him as his child, and treated him as if he were a legitimate child, he became legitimate by virtue of section 4399, Rev. Laws 1910, which provides, in substance, that the father of an illegitimate child, by duly acknowledging it as his own, receiving it as such, with the consent of his wife, into his family, and otherwise treating it as if it were legitimate, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth, and Allison v. Bryan, 21 Okla. 557, 97 P. 282, is cited in support of this contention.
This section of the statute was construed and Allison v. Bryan discussed in Templeman v. Bruner, 42 Okla. 6,138 P. 152, 139 P. 993, and it was there held that an illegitimate mixed-blood Creek citizen having been legitimatized under section 4399, supra, by the father without the consent of the mother, and having died November 4, 1908, without issue, unmarried, intestate, and being survived by his father and mother who had not intermarried, his mother inherited his allotment under section 8421, Rev. Laws 1910, and that the father inherited no part thereof.
By the provisions of section 8420, Rev. Laws 1910, an illegitimate child is the heir of his father if the father in writing, signed in the presence of a competent witness, acknowledged himself to be the father of such *Page 131 
child, and in all cases such illegitimate is an heir of his mother. But an illegitimate child does not represent his father or mother by inheriting any part of the estate of his or her kindred, either lineal or collateral, unless before his death his parents shall have intermarried, and his father after such marriage acknowledges him as his child or adopts him into his family. This section of the statute precludes Prince Tyner from inheriting, as he claims through his father by right of representation.
That part of section 8420, supra, which provides, "the issue of all marriages null in law or dissolved by divorce are legitimate," is identical with the statutory provisions of Virginia, Arkansas, and California, and the Supreme Court of Virginia, in Lemmons v. Harris, 80 S.E. 740, held that such statutory provisions had no possible bearing upon slave marriages, and this was the holding in Ewatt v. Mier (Ark.) 169 S.W. 817, and In re Campbell's Estate (Cal.) 108 P. 669.
Sec. 4366, Rev. Laws 1910, which provides that: "The presumption of legitimacy can be disputed only by the husband or wife, or the descendants of one or both of them. Illegitimacy in such a case, may be proved like any other fact," — has no application to the state of facts existing in this case. Such section of the statute presupposes a marriage between the parties, and in the case at bar no marriage existed between the parents of Prince Tyner.
It is further insisted on behalf of Prince Tyner that it was not the invariable common-law rule that children born of slave marriages were illegitimate, and Erwin v. Noland (Mo.)217 S.W. 837, and Brown v. Cheatham (Tenn.) 17 S.W. 1033, are cited in support of this proposition.
An examination of the decision in Erwin v. Noland, supra, convinces us that it is not authority for the contention made That case held, in effect, that if persons while slaves lived together as husband and wife, and during that status were married according to the usage established for the marriage of slaves, their subsequent mutual acknowledgment of the relation after their emancipation completed the act of matrimony so as to make them lawfully married. It will be seen that the mutual acknowledgment of the relation after emancipation was necessary in order to complete the act of matrimony so as to make them legally married. The parents of Prince Tyner did not mutually acknowledge the relation after emancipation, so under the authority of that case they were not man and wife.
In Brown v. Cheatham, supra, it was held that marriages between slaves, with the consent of their masters, when contracted in common-law form, or celebrated under the statutes, were valid, and the issues of such marriages were legitimate. But in much later cases (Napier v. Church, 177 S.W. 56, and Cole v. Taylor, 177 S.W. 61) the Supreme Court of Tennessee held that a person born of parents while in a state of slavery is regarded as a bastard, as the state of bondage precluded the husband and wife yielding to each other the duty, fealty, and protection that the law requires, and because of this incapacity to contract it necessarily followed that there was no lawful issue, as there was no lawful marriage. Under the legitimating statute of Tennessee, it was held in Sheperd v. Carland, 41 S.W. 340, that the right of inheritance of children of slave marriages was limited to decendants from the parents and does not authorize collateral inheritance, such as is claimed by Prince Tyner.
We conclude that, inasmuch as legitimating legislation affecting the status of Prince Tyner is lacking, he is illegitimate and incapable of inheriting the estate involved.
The plaintiff in error T.E. Elliott, administrator, complains of the 8th and 9th findings of fact, supra, and of the conclusions of law by the trial court, and Insists that the presumption of the legitimacy of William Tyner has not been rebutted by the parties to this cause who assumed the burden of doing so, and that the court erred In finding that Wiliam Tyner was an illegitimate child.
We are unable to say that the finding of the trial court that William Tyner was the illegitimate child of Emily Tyner is against the clear weight of the evidence, but, to the contrary, we think this finding is supported by the evidence. There is evidence in the record to the effect that Andy Tyner, one of the alleged husbands of Emily, died in the year 1892; Willie or William Tyner was, according to the evidence, born in 1896, and in this connection it is significant that nowhere in Emily's testimony taken before the Commission to the Five Civilized Tribes in April, 1901, upon her application for enrollment of herself and five children, did she state that Andy Tyner was the father of William.
The claimants John H. Tyner, Ada Tyner, Daniel Tyner, Addie Reed, and Dave McDade, *Page 132 
Carl B. Sebring, and W.L. Moore have not appealed from the judgment of the trial court, and do not complain thereof.
After a careful consideration of the entire record, we conclude that it shows the Buffington claimants to be the nearest of kin of Frank McDade, Jr., capable of inheriting.
Therefore, the judgment of the trial court is reversed, and the cause remanded, with directions to enter judgment decreeing Henry Buffington, Stella Thornton, Robert Thornton, Sadie Welch, Alice Gordon, Kittie Foreman, Joe Thompson, Johnny Mackey, Henrietta Thornton, Seymore Johnson, Eunice Weleh, and Lone Welch, sole heirs at law of Frank McDade, Jr., deceased, and setting aside and decreeing to them the real and personal property of which said Frank McDade, Jr., died seized, as their interests appear.
JOHNSON, C. J., and KENNAMER, COCHRAN, and HARRISON, JJ., concur.